**LION OIL COMPANY, Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 15158.**

United States Court of Appeals
Eighth Circuit.
April 22, 1955.

---

Jeff Davis, El Dorado, Ark. (B. L. Allen and H. D. Dickens, El Dorado, Ark., on the brief), for petitioner.

Duane Beeson, Washington, D. C. (George J. Bott, David P. Findling, Marcel Mallet-Prevost and Frederick U. Reel, Washington, D. C., on the brief), for respondent.

Lindsay P. Walden and William E. Rentfro, Denver, Colo., filed brief for Oil Workers International Union, CIO, as amici curiæ.

Before SANBORN, JOHNSEN and VOGEL, Circuit Judges.

VOGEL, Circuit Judge.

This case is before the court upon the petition of Lion Oil Company to review and set aside an order of the National Labor Relations Board, and upon request of the Board for enforcement of its order issued against the Lion Oil Company on August 5, 1954, following proceedings under Section 10 of the National Labor Relations Act, as amended, 61 Stat. 136, 29 U.S.C.A. § 151 et seq.

The petitioner, Lion Oil Company (hereinafter referred to as "Company") and Oil Workers International Union CIO (hereinafter referred to as "Union") entered into a collective bargaining contract providing in detail the wages, hours and conditions under which employees should work for the Company during the term of the agreement. Insofar as it is applicable to the problem presented herein, the agreement between the Company and the Union provided as follows:

"Article I
"Term of Agreement

"This agreement shall remain in full force and effect for the period beginning October 23, 1950, and ending October 23, 1951, and thereafter until canceled in the manner hereinafter in this Article provided.

"This agreement may be canceled and terminated by the Company or the Union as of a date subsequent to October 23, 1951, by compliance with the following procedure:

"(a) If either party to this agreement desires to amend the terms of this agree-

ment, it shall notify the other party in writing of its desire to that effect, by registered mail. No such notice shall be given prior to August 24, 1951. Within the period of 60 days, immediately following the date of the receipt of said notice by the party to which notice is so delivered, the Company and the Union shall attempt to agree as to the desired amendments to this agreement.

"(b) If an agreement with respect to amendment of this agreement has not been reached within the 60-day period mentioned in the subsection immediately preceding, either party may terminate this agreement thereafter upon not less than sixty days' written notice to the other. Any such notice of termination shall state the date upon which the termination of this agreement shall be effective."

On August 24, 1951, the Union transmitted by mail to the Company and to the Federal Mediation and Conciliation Service the following letter:

"Oil Workers International Union, C.I.O.
El Dorado Local No. 434
El Dorado, Arkansas

August 24, 1951

Registered Mail
Return Receipt Requested
Special Delivery

"Lion Oil Company
Lion Oil Building
El Dorado, Arkansas
Attention: Mr. T. M. Martin, President
Federal Mediation and Conciliation
Service
14th and Constitution Avenue, N. W.
Washington 25, D. C.

"Gentlemen:

"Pursuant to the provisions of the Labor-Management Relations Act of 1947, you are hereby notified that we desire to modify the collective bargaining contract now in effect between your company and this Union, in accordance with the provisions of the agreement.

"We are attaching hereto some of the proposed changes which we desire to include in a new contract or as modifications to the present agreement. We shall be glad to and now offer to meet and confer with you for the purpose of negotiating a new contract or modifications to the present agreement.

"Copies of this notice are being served upon the Federal Mediation and Conciliation Service, and the appropriate State Agency for the purpose of advising them of this dispute solely because of the alleged requirements of Section 8(d) (3) of the Labor-Management Relations Act of 1947, and subject to the validity of all provisions of such Act.

"Sincerely yours,

Oil Workers International
Union, C.I.O.
By /s/ E. P. Shelton,
Chairman Workmen's Committee
Lion Oil Group Local 434-
OWIU-CIO"

Representatives of the Company and the Union first met on August 29, 1951, to discuss the proposed amendments. Between that date and April 30, 1952, there were 37 meetings held for the same purpose. No agreement was arrived at.

On April 30, 1952, the employees of the Company went on strike for a wage increase and other benefits.

Neither the Company nor the Union notified the other that it intended to *terminate* the contract. On June 21, 1952, after the employees here involved had been on strike continuously from April 30, 1952, the Union offered to return all striking employees to work unconditionally. The Company refused such offer. Subsequently it distributed to all employees copies of a letter to the Union in which it defended its position that there would be no reinstatement of the strikers "until such time as the (employees) are willing to agree to go to work and continue to work for a period of at least one year with no strike or other work stoppage during that period".

Subsequent to June 21st numbers of employees, singly and in groups, appeared at the Company's plant, were interviewed by the plant superintendent and rehired upon the assurance of each individual that he would "continue to come to work daily and continuously throughout the period of the remainder of the strike" and that he would not honor any picket line at the Company's plant. It was made clear that without such assurances no striker would be permitted reinstatement. Between June 21, 1952, and August 3, 1952, 27 negotiation meetings between representatives of the Company and the Union were held in an effort to settle the dispute.

On August 3, 1952, a new agreement was formally executed with the employees being reinstated the following day.

During the period of negotiations the Union filed with the National Labor Relations Board a charge of unfair labor practices against the Company. The charge was based upon the activities of the Company subsequent to the Union's offer to return the strikers to work.

The Company filed an answer to the charge in which it denied the allegations of unfair labor practices and, further, set up as a separate defense the claim that the strike was an unlawful one because it was called by the Union at a time when there was in effect between the Union and the Company a collective bargaining contract; that the strike was in violation of the contract provisions, constituted an unfair labor practice and that the employees participating therein thereby lost their status as employees and were not entitled to relief.

By a split decision, (one member dissenting and one concurring specially) the Board held that the Company was guilty of unfair labor practices within the meaning of Sections 8(a) (1), 8(a) (3) and 8(a) (5) of the National Labor Relations Act and rejected the Company's defense that the strikers had lost the protection of the Act because they had struck while a contract was in effect. It is this decision and the resulting order that are under review here.

The primary question is this: Was the strike of April 30, 1952 in violation of the agreement between the parties and contrary to the provisions of Section 8 (d) of the Act? The relevant portions of that Section are as follows:

"* * * where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification—

"(1) serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof, or in the event such contract contains no expiration date, sixty days prior to the time it is proposed to make such termination or modification;

\* \* \* \* \* \*

"(4) continues in full force and effect, without resorting to strike or lock-out, all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later:

"* * * Any employee who engages in a strike within the sixty-day period specified in this subsection shall lose his status as an employee of the employer engaged in the particular labor dispute, for the purposes of sections 8, 9 and 10 of this Act, as amended * * *."

In its decision the Board held, in effect that while the contract was in force at the time of the strike, it was not a contract of fixed duration and that the notice of August 24, 1951 with reference to modification satisfied the provisions of Section 8(d) and that accordingly the

strike was not unlawful. The majority opinion stated:

"It suffices for our decision here that the contract specifically provided for modification and that the earliest date on which modification could be made effective was October 23, 1951. The notice was given precisely 60 days before that date. As the notice was served on August 24, the end of the 60 days statutory period and the date fixed in the contract for making modifications (which, as indicated above, we consider tantamount to 'expiration' as that term is used in Section 8(d) (4)) coincided. Thus, the Union, before striking to enforce its economic demands satisfied the statutory requirements, and consequently the striking employees never lost the protection accorded economic strikers by the Act."

We cannot agree with such interpretation of the Act nor with the majority's apparent disregard of the plain provisions of the contract between the parties. The contract, in the first paragraph, provides that it shall remain in effect for a fixed period; that is, October 23, 1950 to October 23, 1951, *"and thereafter until canceled in the manner herein in this Article provided"*. (Emphasis supplied.) After October 23, 1951, the contract became an indefinite one as to time but terminable at the will of either party upon complying with the specific provisions therein set forth.

■ The provisions with reference to *amendment* and *termination* are separately stated and are clear and unambiguous. If either party to the agreement desired to *amend* the terms thereof it would have to notify the other in writing of such desire. No such notice could be given prior to August 24, 1951. During the period of 60 days immediately following the date of the receipt of such notice, the Company and the Union were to attempt to agree as to amendments proposed. If an agreement with respect to the proposed amendments was not reached within the 60-day period following the no-

tice, then " * * * either party may terminate this agreement *thereafter* upon not less than 60 days' written notice to the other". (Emphasis supplied.) The wording and the intent of the contract are clear. The word "thereafter" can only refer to a time *after* attempts to negotiate amendments had failed for a period of not less than 60 days. Then, and only then, could either party terminate the contract and then only by resorting to the provisions with reference to notice and a waiting period of 60 days.

We note that the Supreme Court of Arkansas, in referring to the same striking employees and the same contract here involved, said in Lion Oil Co. v. Marsh, 220 Ark. 678, 249 S.W.2d 569, 571:

*"Agreement in Force.* It can hardly be disputed that the agreement referred to above was in full force when the strike and picketing occurred, as a casual reading of Article I set out above will show. Appellees (union member employees) could have easily effected a legal cancellation of the contract by giving the notice provided for therein, but the record does not show this notice was given. Since the terms of the agreement provided for an automatic continuation after October 23rd, 1951 the burden was on appellees to show they had terminated the agreement by giving the required notice, but this burden has not been met. * * * "

■■ We thus had in existence on April 30, 1952 a collective bargaining contract, binding upon the Company and the Union, indefinite as to time but terminable by either party upon 60 days' notice. The Board would disregard the separate provisions in the contract with reference to *termination* as distinguished from *amendment*. In interpretation, contracts, whether labor or otherwise, are entitled to their plain, ordinary meaning. The intent of the parties to the contract appears obvious—a fixed status quo for a period of one year; the possibility of bilateral action to amend after the ex-

piration of the first ten months, and, thereafter, a period of 60 days for negotiation; and the possibility of unilateral termination by either party after the expiration of the one year and upon the giving of 60 days' notice thereafter. They would not have had to so contract. The point is that they did and the contract is binding upon both and continues after the fixed period of one year for an indefinite time unless terminated by either party thereafter in accordance with the provisions relating to *termination*.

 There being in existence at the time of the strike a collective bargaining agreement between the Company and the Union, the situation is not too dissimilar to that presented in Local No. 3, United Packinghouse Workers of America, CIO v. National Labor Relations Board, 8 Cir., 210 F.2d 325, at pages 332 and 333, in which this court said:

"The strike was not called until after sixty days after the giving of the required notice. However, the expiration date of the collective bargaining contract between the company and the union expired later and hence it is argued that no strike could properly be called until after the expiration date of the contract. The Board strenuously argues that so construing the statute would to a considerable extent be destructive of its purpose. It is urged that so construed there could be no strike during the life of the contract between the employer and the union. That argument we think a very proper one to be addressed to the Congress and apparently it was urged upon Congress.

*   *   *   *   *   *

"We are of the view that by going out on strike before the expiration date of the collective bargaining contract the employees lost their status as employees of the company and hence they were not entitled to re-employment as a matter of right."

We have here in the instant case a situation where the Union and the Company sought industrial peace through a collective bargaining agreement providing for a period of negotiation after notice of a desire to *amend* and a waiting period after notice of *termination* which could only follow failure to agree. The Board's decision would read out or ignore that part of the agreement dealing with notice of *termination* and the 60 days' waiting period to follow. That may not be done. The parties had a right to contract as they did and the plain provisions of their mutual agreement should be enforced.

At the time of the strike in question there existed a binding contract between the Union and the Company. It had not been terminated in accordance with its provisions. The strike was accordingly in violation of Section 8(d) and the strikers lost their status as employees of the Company and are not entitled to the relief provided in the Board's order.

The request of the Board for enforcement of its order is denied, and the order is set aside.