NATIONAL LABOR RELATIONS BOARD *v.* LION
OIL CO. ET AL.

No. 4.  Argued October 8, 1956.—Decided January 22, 1957.

*Theophil C. Kammholz* argued the cause for petitioner. With him on the brief were *Solicitor General Rankin, Marvin E. Frankel* and *Dominick L. Manoli.*

*Jeff Davis* argued the cause for respondents. With him on the brief were *B. L. Allen* and *Sam Pickard, Jr.*

Mr. Chief Justice Warren delivered the opinion of the Court.

In this case we are called upon again to interpret § 8 (d) of the National Labor Relations Act, as amended.[1]

---

[1] "Sec. 8. . . .

"(d) For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession: *Provided,* That where there is in effect a collective-bargaining contract covering employees in an

See *Mastro Plastics Corp.* v. *Labor Board,* 350 U. S. 270.
In particular we are concerned with § 8 (d)(4), which
provides that a party who wishes to modify or terminate

industry affecting commerce, the duty to bargain collectively shall also
mean that no party to such contract shall terminate or modify such
contract, unless the party desiring such termination or modification—

"(1) serves a written notice upon the other party to the contract
of the proposed termination or modification sixty days prior to the
expiration date thereof, or in the event such contract contains no
expiration date, sixty days prior to the time it is proposed to make
such termination or modification;

"(2) offers to meet and confer with the other party for the purpose
of negotiating a new contract or a contract containing the proposed
modification;

"(3) notifies the Federal Mediation and Conciliation Service within
thirty days after such notice of the existence of a dispute, and simul-
taneously therewith notifies any State or Territorial agency estab-
lished to mediate and conciliate disputes within the State or Territory
where the dispute occurred, provided no agreement has been reached
by that time; and

"(4) continues in full force and effect, without resorting to strike
or lock-out, all the terms and conditions of the existing contract for
a period of sixty days after such notice is given or until the expiration
date of such contract, whichever occurs later:

The duties imposed upon employers, employees, and labor organiza-
tions by paragraphs (2), (3), and (4) shall become inapplicable upon
an intervening certification of the Board, under which the labor
organization or individual, which is a party to the contract, has been
superseded as or ceased to be the representative of the employees
subject to the provisions of section 9 (a), and the duties so imposed
shall not be construed as requiring either party to discuss or agree
to any modification of the terms and conditions contained in a contract
for a fixed period, if such modification is to become effective before
such terms and conditions can be reopened under the provisions of
the contract. Any employee who engages in a strike within the
sixty-day period specified in this subsection shall lose his status as
an employee of the employer engaged in the particular labor dispute,
for the purposes of sections 8, 9, and 10 of this Act, as amended, but
such loss of status for such employee shall terminate if and when
he is reemployed by such employer." 61 Stat. 140, 142–143, 29
U. S. C. § 158 (d).

a collective bargaining contract must continue "in full force and effect, without resorting to strike or lockout, all the terms and conditions of the existing contract for a period of sixty days after . . . notice [of his wish to modify or terminate] is given or until the expiration date of such contract, whichever occurs later." Since § 8 (d) defines the duty to bargain collectively, a violation of § 8 (d)(4) constitutes a refusal to bargain, an unfair labor practice for employers, § 8 (a)(5), and unions, § 8 (b)(3). The last sentence of § 8 (d) contains an additional sanction: an employee who strikes within the specified 60-day period loses his status as an employee for the purposes of §§ 8, 9 and 10 of the Act. The sole question presented by the petition for certiorari is:

> Whether the requirement of this Section is satisfied where a contract provides for negotiation and adoption of modifications at an intermediate date during its term, and a strike in support of modification demands occurs after the date on which such modifications may become effective—and after the 60-day notice period has elapsed—but prior to the terminal date of the contract.

We are told by the Solicitor General that the question is of major importance in the negotiation and administration of hundreds of collective bargaining agreements throughout the country; that there is a decided trend among unions and employers to execute contracts of longer duration than formerly and to include provisions for reopening to negotiate changes during the contract term.[2] Because of the importance of the question, we granted certiorari, 350 U. S. 986, to review a decision of the Court of Appeals for the Eighth Circuit to the effect that § 8 (d)(4) bans strikes to obtain modifications of a

---

[2] BNA, Collective Bargaining Negotiations and Contract Service, 36:301.

contract until the contract by its terms or by the action of the parties has terminated.

On October 23, 1950, respondent Lion Oil Co. and the Oil Workers International Union, CIO, entered into a contract which provided:

> "This agreement shall remain in full force and effect for the period beginning October 23, 1950, and ending October 23, 1951, and thereafter until canceled in the manner hereinafter in this Article provided.
>
> "This agreement may be canceled and terminated by the Company or the Union as of a date subsequent to October 23, 1951, by compliance with the following procedure:
>
> "(a) If either party to this agreement desires to amend the terms of this agreement, it shall notify the other party in writing of its desire to that effect, by registered mail. No such notice shall be given prior to August 24, 1951. Within the period of 60 days, immediately following the date of the receipt of said notice by the party to which notice is so delivered, the Company and the Union shall attempt to agree as to the desired amendments to this agreement.
>
> "(b) If an agreement with respect to amendment of this agreement has not been reached within the 60-day period mentioned in the sub-section immediately preceding, either party may terminate this agreement thereafter upon not less than sixty days' written notice to the other. Any such notice of termination shall state the date upon which the termination of this agreement shall be effective."

On August 24, 1951, the union served written notice on the company of its desire to modify the contract.[3]   Nego-

---

[3] Copies of the notice were sent to the Federal Mediation and Conciliation Service and to the Arkansas Labor Commissioner to comply with § 8 (d) (2).

tiations began on the contractual changes proposed by the union. The union members voted for a strike on February 14, 1952, but the strike, thrice postponed as negotiations continued, did not actually begin until April 30, 1952. The union never gave notice to terminate the contract as contemplated by the quoted contractual provision. Therefore, at all relevant times a collective bargaining agreement was in effect. On August 3, a new contract was executed, and the strikers began to return to work the following day. Certain actions of the company during the strike were the basis of unfair labor practice charges by the union upon which a complaint issued.

The Labor Board found that the company was guilty of unfair labor practices under § 8 (a)(1), (3) and (5) of the Act. The company defended on the ground that the strike, because it occurred while the contract was in effect, was in violation of § 8 (d)(4). A majority of the Board rejected this defense, holding that

> "The term 'expiration date' as used in Section 8 (d)(4) . . . has a twofold meaning; it connotes not only the terminal date of a bargaining contract, but also an agreed date in the course of its existence when the parties can effect changes in its provisions."

The Board held that since, under the contract in dispute, October 23, 1951, was such an "agreed date," the notice given August 24 followed by a wait of more than 60 days satisfied the statute. The company was ordered to cease and desist and, affirmatively, to make whole employees found to have been discriminated against. 109 N. L. R. B. 680, 683.

On the company's petition for review, the Court of Appeals set aside the Board's order. 221 F. 2d 231. The court held that the "expiration date" of the contract was the date on which all rights and obligations under it would

cease; that the second notice required to bring about this termination not having been given, the strike violated § 8 (d)(4) and the strikers therefore lost their status as employees entitled to the protection of the Act.[4]

In *Mastro Plastics Corp.* v. *Labor Board, supra,* we had before us another provision of § 8(d). What we said there in ruling out a narrowly literal construction of the words of the statute is equally apropos here. "If the above words are read in complete isolation from their context in the Act, such an interpretation is possible. However, 'In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.' *United States* v. *Boisdoré's Heirs,* 8 How. 113, 122." 350 U. S., at 285. Moreover, in *Mastro Plastics* we cautioned against accepting a construction that "would produce incongruous results." *Id.,* at 286.

That § 8 (d)(4) is susceptible of various interpretations is apparent when § 8 (d) is read as a whole. Its ambiguity was recognized by the Joint Committee of Congress created by the very act of which § 8 (d) was a part to study the operation of the federal labor laws.[5] Members of the National Labor Relations Board, the agency specially charged by Congress with effectuating the purposes of the national labor legislation, have expressed divergent views on the proper construction of § 8 (d)(4); none of them has taken the position adopted

[4] The only other case in the Courts of Appeals involving the question presented here is *Local No. 3, United Packinghouse Workers* v. *Labor Board,* 210 F. 2d 325, cert. denied, 348 U. S. 822, also decided by the Eighth Circuit. The court there construed § 8 (d)(4) as it did here, although on its facts the decision is reconcilable with the Board's construction of the section in this case.

[5] Joint Committee on Labor-Management Relations, Final Report, S. Rep. No. 986, Pt. 3, 80th Cong., 2d Sess. 62–63.

by the court below.[6]   In the face of this ambiguity it will not do simply to say Congress could have made itself clearer and automatically equate the phrase "expiration date" only with the date when a contract comes to an end.

We find our guide to the general context of the statute in *Mastro Plastics.*   In that case we recognized a "dual purpose" in the Taft-Hartley Act—to substitute collective bargaining for economic warfare and to protect the right of employees to engage in concerted activities for their own benefit.   350 U. S., at 284.   A construction which serves neither of these aims is to be avoided unless the words Congress has chosen clearly compel it.   The restriction on employees' concerted activities which would result from the construction placed upon § 8 (d)(4) by the Court of Appeals is obvious.[7]   Too, we think it would discourage the development of long-term bargaining relationships.   Unions would be wary of entering into long-term contracts with machinery for reopening them for modification from time to time, if they thought the right to strike would be denied them for the entire term of such a contract, though they imposed no such limitations on themselves.

We do not believe that the language used by Congress requires any such result.   Section 8 (d)(1) provides that

---

[6] The Board's original view in *Wilson & Co.,* 89 N. L. R. B. 310, was that § 8 (d) permitted strikes in support of contract changes any time after 60 days' notice.   Member Peterson, concurring specially in the present case, adhered to that view. ' Member Murdock dissented on the same ground on which he had concurred specially in *Wilson & Co.,* namely, that § 8 (d) applies only during the period around the termination of a contract.

[7] Cf. § 13 of the Act: "Nothing in this Act, except as specifically provided for herein, shall be construed so as either to interfere with or impede or diminish in any way the right to strike, or to affect the limitations or qualifications on that right."   61 Stat. 151, 29 U. S. C. § 163.

no party to an existing collective bargaining contract
"shall terminate or modify such contract, unless the party
desiring such termination or modification—(1) serves a
written notice upon the other party to the contract of the
proposed termination or modification sixty days prior to
the expiration date thereof . . . ." The phrase "expira-
tion date" is repeated in § 8 (d)(1) and again in the
"whichever occurs later" clause of § 8 (d)(4) upon which
this case turns. The use of the three words "termina-
tion," "modification" and "expiration" is significant.
We conceive that a notice of desired modification would
typically be served in advance of the date when the con-
tract by its own terms was subject to modification.
Notice of desired termination would ordinarily precede
the date when the contract would come to an end by its
terms or would be automatically renewed in the absence
of notice to terminate. Therefore we conclude that Con-
gress meant by "expiration date" in § 8 (d)(1) to encom-
pass both situations, and the same phrase in § 8 (d)(4)
must carry the same meaning. "Expiration" has no such
fixed and settled meaning as to make this an unduly
strained reading.

Our conclusion is buttressed by a provision of § 8 (d)
which was added by the Conference Committee.[8]

> "[T]he duties . . . imposed [by subsections (2),
> (3) and (4)] shall not be construed as requiring
> either party to discuss or agree to any modification
> of the terms and conditions contained in a contract
> for a fixed period, if such modification is to become
> effective before such terms and conditions can be
> reopened under the provisions of the contract."

The negative implication seems clear: Congress recog-
nized a duty to bargain over modifications when the con-

---

[8] H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess. 35.

tract itself contemplates such bargaining. It would be anomalous for Congress to recognize such a duty and at the same time deprive the union of the strike threat which, together with "the occasional strike itself, is the force depended upon to facilitate arriving at satisfactory settlements." [9]

Although a 1948 committee report is no part of the legislative history of a statute enacted in 1947, we note that the Joint Committee on Labor-Management Relations, made up of members of the Congress which passed the Taft-Hartley Act, in its final report reached the same conclusion we do:

> "Reading section 8 (d) as a whole seems to lead to the conclusion that the act permits a strike, after a 60-day notice, in the middle of a contract which authorizes a reopening on wages. Use of the words 'or modify' and 'or modification' in the proviso, and use of 'or modification' in section 8 (d)(1), and the statement in the final paragraph of the section that the parties are not required to agree to any modification effective before the contract may be reopened under its terms, all seem to contemplate the right of either party to insist on changes in the contract if they have so provided. The right of the union would be an empty one without the right to strike after a 60-day notice." [10]

[9] Subcommittee on Labor and Labor-Management Relations, Factors in Successful Collective Bargaining, S. Rep. under S. Res. 71, 82d Cong., 1st Sess. 7 (Committee Print).

[10] S. Rep. No. 986, Pt. 3, 80th Cong., 2d Sess. 62. In 1949 Senator Taft, who was a member of the Joint Committee, introduced a clarifying amendment to § 8 (d). See S. Rep. No. 99, Pt. 2, 81st Cong., 1st Sess. 42 (minority report). The amendment, along with a group of others, passed the Senate, 95 Cong. Rec. 8717, but did not become law.

The contemporary legislative history manifests no real recognition of the problem before us.[11] A reading of the committee reports and the floor debates alone could well lead to the conclusion that both the sponsors and the opponents of the bill saw in § 8 (d)(4) no more than a means for preventing "quickie" strikes by requiring a "cooling-off" period which would not in any circumstances exceed 60 days.[12] But the language used in the statute goes beyond this limited purpose. Significance must be given to the clause, "or until the expiration date of such contract, whichever occurs later." We believe our construction gives meaning to the congressional language which accords with the general purpose of the Act.

Applying that construction to the facts of this case, we hold that the notice and waiting requirements of § 8 (d) were fully satisfied. October 23, 1951, was the first date upon which the contract by its terms was subject to amendment. Notice of proposed amendments was served 60 days in advance. The strike did not occur until long afterward. The fact that on October 23 the contract became terminable upon further notice by either party is immaterial. One thing the most authoritative legislative gloss on § 8 (d), the report of the Senate Committee, makes clear is that the statutory notice

---

[11] See S. Rep. No. 105, 80th Cong., 1st Sess. 24; *id.*, Pt. 2, pp. 21–22; H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess. 34–35. See also 93 Cong. Rec. 3835, 3839, 4036, 4904–4905, 5005, 5014, 6385, 6389, 6444, 6503–6504, 7530.

[12] The minority members of the Senate Committee which reported out the bill containing § 8 (d) did say that the effect of it was to incorporate no-strike clauses into labor contracts "by legislative fiat." The context, however, makes it tolerably clear that they were referring to a ban on strikes during the 60-day notice period. S. Rep. No. 105, Pt. 2, 80th Cong., 1st Sess. 22.

requirement operates wholly independently of whatever notice requirement the parties have fixed for themselves.[13] The situation here is not different, so far as the applicability of the statute is concerned, from that of a fixed-term contract with a clause providing for reopening at some specific time.

Nor can we accept respondents' alternative contention that, even apart from § 8 (d), the strike was in breach of contract and the strikers were for that reason not entitled to relief at the hand of the Board. Respondents rely upon *Labor Board* v. *Sands Mfg. Co.,* 306 U. S. 332. In *Sands,* as in this case, the contract did not contain an express no-strike clause. Employees there refused in the course of the contract to continue work "in accordance with their contract." *Id.,* at 344. The refusal occurred midway in a fixed-term contract which did not provide for modifications during its term. This Court sustained the propriety of the employer's action in discharging the employees. Here the strike occurred at a time when the parties were bargaining over modifications after notice and in accordance with the terms of the contract. Where there has been no express waiver of the right to strike,[14] a waiver of the right during such a period is not to be inferred. We do not believe that the two-phase provision for terminating this contract means that it was not within the contemplation of the parties that

---

[13] Section 8 (d) originated in the Senate. The Committee said, "It should be noted that this section [§ 8 (d)] does not render inoperative the obligation to conform to notice provisions for longer periods, if the collective agreement so provides. Failure to give such notice, however, does not become an unfair labor practice if the 60-day provision is complied with." S. Rep. No. 105, 80th Cong., 1st Sess. 24.

[14] A no-strike clause was one of the company's demands during the negotiations in this case.

economic weapons might be used to support demands for modification before the notice to terminate was given.

The judgment below is reversed and the case remanded for proceedings in conformity with this opinion.

*Reversed and remanded.*

Mr. Justice Brennan took no part in the consideration or decision of this case.

Mr. Justice Frankfurter, concurring in part and dissenting in part.

Agreeing as I do with the Court's construction of § 8 (d) of the National Labor Relations Act, as amended, I join its opinion on that phase. But I do not think that the Court should now pass upon respondent's alternative defense of breach of contract, which the Court of Appeals did not reach because of its view of the statute. Perhaps that question is not open for judicial consideration. Section 10 (e) of the Act provides that:

> "No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." [1]

The Board has not raised the point here, and it is not clear from the record that respondent urged this objection before the Board. In any event, it is not for this Court in the first instance to construe this particular contract. In remanding the case I would therefore leave it to the Court of Appeals to determine: (1) whether respondent has complied with § 10 (e); (2) whether in this contract an agreement not to strike is reasonably to be implied; and (3) whether respondent continued its

---

[1] Section 10 (f) specifies that this rule shall apply where judicial review of a Board order is obtained by an aggrieved person.

employment relationship with the strikers and should on that account be subject to the consequences of its alleged unfair labor practices even if the strike was in violation of contract. Finally, it is for the Court of Appeals to judge whether the record as a whole supports the Board's findings of unfair labor practices. *Universal Camera Corp.* v. *Labor Board,* 340 U. S. 474, 491.

The inherent complications of the problem of statutory construction, as reflected in the conflicting views of the members of the Labor Board, make further discussion desirable, even though this may entail some repetition of what is said in the Court's opinion. Section 8 (d) defines the duty of the employer and the union to bargain collectively. A long proviso in the section treats specifically of this duty where a collective-bargaining agreement is in effect. The proviso must be considered in its entirety:

"That where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification—

"(1) serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof, or in the event such contract contains no expiration date, sixty days prior to the time it is proposed to make such termination or modification;

"(2) offers to meet and confer with the other party for the purpose of negotiating a new contract or a contract containing the proposed modification;

"(3) notifies the Federal Mediation and Conciliation Service within thirty days after such notice of the existence of a dispute, and simultaneously therewith notifies any State or Territorial agency estab-

lished to mediate and conciliate disputes within the State or Territory where the dispute occurred, provided no agreement has been reached by that time; and

"(4) continues in full force and effect, without resorting to strike or lock-out, all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later:

"The duties imposed upon employers, employees, and labor organizations by paragraphs (2), (3), and (4) shall become inapplicable upon an intervening certification of the Board, under which the labor organization or individual, which is a party to the contract, has been superseded as or ceased to be the representative of the employees subject to the provisions of section 9 (a), and the duties so imposed shall not be construed as requiring either party to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period, if such modification is to become effective before such terms and conditions can be reopened under the provisions of the contract. Any employee who engages in a strike within the sixty-day period specified in this subsection shall lose his status as an employee of the employer engaged in the particular labor dispute, for the purposes of sections 8, 9, and 10 of this Act, as amended, but such loss of status for such employee shall terminate if and when he is reemployed by such employer."

The reasoned efforts of the five members of the Board and the three Circuit Judges whose task it has been to apply this proviso to the problem before us—where an economic strike occurs prior to the contract's termination but pursuant to its reopening provisions and after sixty

days' notice—have produced four distinct interpretations of the Act. The Court of Appeals, relying on its previous decision in *Wilson & Co.* v. *Labor Board,* 210 F. 2d 325, adopted respondent's contention that "expiration date" means termination date and that § 8 (d)(4) therefore bans all bargaining strikes throughout the life of a collective-bargaining contract. The Board majority held that "expiration date" also comprehends "an agreed date in the course of [the contract's] existence when the parties can effect changes in its provisions . . ." and that § 8 (d) prohibits all strikes during the life of the contract except those in support of bargaining pursuant to a reopening clause. Member Peterson adhered to the Board's former interpretation, see *Wilson & Co.,* 89 N. L. R. B. 310, that so long as the union gives notice of its desire to modify the contract sixty days before striking, § 8 (d) does not prohibit a strike at any time during the life of the contract. Finally, Member Murdock argued that § 8 (d) "applies only to the period around the expiration date of a contract," which he defined to mean its termination date, and that prior to that period a union may strike without any notice whatsoever.

Such diverse interpretations, particularly by the authorities charged with the administration of the Act, reflect not only the ambiguity of § 8 (d)'s language but also the obscurity of its legislative history. The fact is that the Taft-Hartley Congress did not reveal its "intention" regarding our present problem—the legality of economic strikes prior to the contract's ending. It has thus become a judicial responsibility to find that interpretation which can most fairly be said to be embedded in the statute, in the sense of being most harmonious with its scheme and with the general purposes that Congress manifested.

The construction placed upon the proviso by the Court of Appeals—that it bans strikes throughout the life of

the contract, even at reopening—seems least tenable. Although expiration is a common synonym for termination, § 8 (d) does not use the terms interchangeably. It speaks repeatedly of "termination or modification," while "expiration" seems to embrace both events. Moreover, this section provides that it

> "shall not be construed as requiring either party to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period, if such modification is to become effective before such terms and conditions can be reopened under the provisions of the contract."

This implies an affirmative duty to bargain during reopening. It is not to be assumed that Congress provided such a duty and at the same time foreclosed a potential strike, a conventional factor in the collective-bargaining process.

The meaning given to "expiration date" by the Court of Appeals would make § 8 (d) achieve other anomalous results. For example, where there is in effect a two-year contract providing for reopening after one year, the party proposing modification at reopening would not be required by § 8 (d)(1) to serve notice upon the other party until ten months after reopening had passed, and § 8 (d)(3) would not require notice to mediating agencies until eleven months after reopening. Similarly, the loss-of-status sentence, which applies to employees who strike "within the sixty-day period specified in this subsection . . . ," would punish only employees who strike ten months following reopening.

Nothing in § 8 (d)'s legislative history warrants such a strained construction. To be sure, at one point in the Senate debate Senator Taft did say that "If such [sixty days'] notice is given, the bill provides for no waiting period except during the life of the contract itself." But

Senator Taft's attention was directed solely to strikes at termination, and this statement was intended merely to emphasize the point made in the following sentence that if notice is given less than sixty days prior to termination the waiting period extends beyond the life of the contract.[2]

Section 8 (d)'s subsequent legislative history affords persuasive evidence that a reasonable interpretation of what the Taft-Hartley Congress legislated is that it allowed bargaining strikes at reopening if preceded by sixty days' notice. When, in 1948, the ambiguity in the statutory language was called to the attention of Congress, the Joint Committee on Labor-Management Relations, of which Senator Taft was a member, recommended a clarifying amendment in order to avoid the possibility that § 8 (d) might be interpreted as either banning strikes at reopening or as permitting strikes prior to reopening. The Committee Report stated:

> "In order that the parties may better know their rights in the matter, the committee recommends the adoption of the amendments which would permit a

---

[2] Senator Taft's full statement was:

"We have provided in the revision of the collective-bargaining procedure, in connection with the mediation process, that before the end of any contract, whether it contains such a provision or not, either party who wishes to open the contract may give 60 days' notice in order to afford time for free collective bargaining, and then for the intervention of the Mediation Service. If such notice is given, the bill provides for no waiting period except during the life of the contract itself. If, however, either party neglects to give such notice and waits, let us say, until 30 days before the end of the contract to give the notice, then there is a waiting period provided during which the strike is an unlawful labor practice for 60 days from that time, or to the end of the contract and 30 days beyond that time. In that case there is a so-called waiting period during which a strike is illegal, but it is only brought about by the failure of the union itself to give the notice which the bill requires shall be given. So it seems to me to be no real limitation of the rights of labor unions." 93 Cong. Rec. 3839.

strike or a lock-out after a 60-day notice in support of demands they have anticipated in a reopening clause." S. Rep. No. 986, 80th Cong., 2d Sess. 63 (1948).

In 1949, Senator Taft himself proposed such an amendment, S. Rep. No. 99, 81st Cong., 1st Sess. 27, 42 (1949), which was passed by the Senate, 95 Cong. Rec. 8717, but never became law.

At the opposite end of the statutory spectrum is Board Member Murdock's view that § 8 (d) only bars strikes at termination, leaving unions free to strike without any notice whatsoever prior to the last sixty days of the contract. Ignoring the introductory paragraph of the proviso, which states: "Where there is in effect a collective-bargaining contract . . . no party to such contract shall terminate or modify such contract, unless . . . ," Mr. Murdock urged that the rest of the proviso contemplates the situation "around" the contract's "expiration date," which he defined as termination date. From this he inferred that § 8 (d) only regulates conduct during this period.

If Mr. Murdock read "expiration" to include reopening, his claim to have resolved § 8 (d)'s logical inconsistencies would be more persuasive. The difficulty of his position is made manifest by the last part of the penultimate sentence of § 8 (d), which clearly implies that the subsection applies to modifications under a reopening clause. The statement of Senator Ball, a leading proponent of § 8 (d), that "ours is a very mild provision, which merely says to unions, 'You must have a 60-day reopening clause in your contract'," 93 Cong. Rec. 7530, and § 8 (d)'s subsequent legislative history, erase any doubt that it was intended to operate at least at reopening as well as at termination.

Even as thus revised the Murdock view is an artifact. It would permit a union, in an effort to force changes in

its contract, to stop work without warning at any time except during the last sixty days of the period fixed by contract and to remain out for the length of the period short of its last sixty days. Yet Mr. Murdock mentioned no factors that would have made Congress so concerned about strikes at expiration as to lay down elaborate procedures applicable thereto and so unconcerned about strikes prior to the expiration period as to ignore them. The legislative history, on the other hand, makes clear that the dominant purpose of Congress in passing § 8 (d) was one that is applicable to strikes at both times—to prevent the damaging effects of strikes without warning and to allow a cooling-off period during which differences might be discussed, mediated and resolved. See, *e. g.,* 93 Cong. Rec. 3839, 5005, 5014. If anything, § 8 (d)'s application would appear more necessary between expiration periods than during them, since the parties have by their contract warned each other of the possibility of work stoppage at the latter times.

It is significant also that the 1948 report of the Joint Committee on Labor-Management Relations, S. Rep. No. 986, 80th Cong., 2d Sess. 62 (1948), which stated that § 8 (d) was subject to three interpretations, did not mention Mr. Murdock's among them. Moreover, since the clarifying amendment proposed by the Committee was designed to preclude the possibility that § 8 (d) might be construed to permit strikes at any time prior to reopening upon sixty days' notice, the Committee must have rejected, *a fortiori,* the possibility that § 8 (d) permitted strikes at any time prior to reopening in the absence of such notice. The Murdock view was also rejected by the Board's General Counsel shortly after the Act's passage. He issued a complaint in the *Wilson* case, *supra,* even though the strike occurred more than nine months before the contract's reopening date. See 89 N. L. R. B. 310, 317, and S. Rep. No. 986, 80th Cong., 2d Sess. 62 (1948).

Mr. Murdock pointed out that the Senate Report on the Taft-Hartley bill stated, with respect to § 301, that a no-strike clause was something to be bargained for, S. Rep. No. 105, 80th Cong., 1st Sess. 17–18, and he reasoned that it would not have said this "If it had been intended to remove no-strike provisions from the realm of collective bargaining . . . ." This argument would have force against an interpretation which actually does remove such provisions from bargaining. Section 8 (d), however, has no effect on whether unions may validly strike over non-bargaining matters. See *Mastro Plastics Corp.* v. *Labor Board,* 350 U. S. 270. Nor does it render obsolete union pledges not to resort to bargaining strikes at reopening, if the present Board's interpretation is correct, or at any time after sixty days' notice, if the view of the former Board prevails. In any event, this statement from the Committee report on another section of the bill provides a flimsy basis for frustrating the oft-expressed legislative purpose of preventing "quickie" strikes.

The question remains whether the old Board's interpretation is more persuasive than that of the present Board. The statutory language points toward the latter view—that § 8 (d) not only proscribes strikes on less than sixty days' notice but also forbids strikes prior to reopening or termination. Section 8 (d)(1) requires the party proposing a change in the contract to give sixty days' notice prior to "expiration," thereby implying that the proposed change will not take place until that time. Only in the event the contract contains no expiration date does this subsection provide for notice "sixty days prior to the time it is proposed to make such termination or modification; . . . ." Section 8 (d)(4) explicitly proscribes strikes "for a period of sixty days after such notice [that provided for in (1)] is given or until the expiration date of such contract, whichever occurs later." And the last part of § 8 (d)'s penultimate sentence provides further

evidence that Congress contemplated modification of the contract's terms only at reopening. The loss-of-status clause alone is more favorable to the former Board's view, since it speaks of "the sixty-day period specified in this subsection," and, to be effective under the present Board's construction, this clause has to be understood as reading "the period specified in paragraph (4)." Since the problem before us was not anticipated, it is not surprising that § 8 (d)'s legislative history offers little direct evidence that Congress did more than require a sixty-day waiting period prior to bargaining strikes. When the Joint Committee did note the problem in 1948, however, it adopted the present Board's view of the statute and not that of the old Board. The light which this subsequent history sheds on the ambiguity reinforces the present Board's construction as the more persuasive interpretation of § 8 (d).

As the Court's opinion holds, since the union struck more than sixty days after giving notice of its desire to amend and in the course of negotiations pursuant to the contract's reopening clause, the Court of Appeals erred in setting aside the Board's order on the ground that the strike violated the waiting requirements of § 8 (d).

Mr. Justice Harlan, concurring in part and dissenting in part.

I join in so much of the Court's opinion as relates to the construction of § 8 (d), agreeing with The Chief Justice's reasoning and Mr. Justice Frankfurter's further amplification of that problem. But I dissent from that part of the Court's opinion which dismisses respondent's breach of contract defense. That question was never passed on by the Court of Appeals, and I think that our remand should leave it open for the Court of Appeals to decide in the first instance. Further, I find the Court's opinion unclear as to whether the Court of Appeals is like-

wise foreclosed from now dealing with the sufficiency of the evidence as to the unfair labor practice charge against respondent—a question which the Court of Appeals also did not reach because of its views on § 8 (d)—and I think that question, too, should be left open for the Court of Appeals on remand.

This is the fourth time this Term that the Court has passed on questions which the court below never reached. See *Mesarosh* v. *United States,* 352 U. S. 1;[1] *Thompson* v. *Coastal Oil Co.,* 352 U. S. 862;[2] *Gibson* v. *Phillips Petroleum Co.,* 352 U. S. 874.[3] I think this practice is an unfortunate one, depriving this Court, as it does, of the considered views of the lower courts. Its dangers are particularly apparent in the present case. As my brother FRANKFURTER points out, there is at least some question as to whether respondent ever raised its breach of contract defense before the National Labor Relations Board. And on the merits the question is an unusual one because of the atypical nature of this contract, and surely requires

---

[1] This Court granted the defendants a new trial on the ground that their conviction was tainted by prosecution evidence suspected to be perjurious. Neither the trial court nor the Court of Appeals had passed on this question, and there had been no investigation as to the reliability of the testimony or its precise bearing on the case.

[2] The Court of Appeals reversed a judgment for the plaintiff in an unseaworthiness case on the ground that plaintiff had signed a valid release. This Court reversed, holding the release invalid, and reinstated the judgment of the District Court. The Court of Appeals therefore never had an opportunity to pass on the other points raised by the defendant on its appeal, mainly the question whether there was sufficient evidence for the finding that the vessel was unseaworthy.

[3] The Court of Appeals had held that as a matter of Texas law plaintiff was barred from recovery by his own contributory negligence. This Court reversed and reinstated the judgment of the District Court. Again, the Court of Appeals had no opportunity to pass on alleged errors of the trial court in instructing the jury, that court not having reached those questions on the initial appeal.

for its reliable adjudication much sharper consideration than it is possible for this Court to give it here as an original matter. Indeed, the nature of the question is such that the Court of Appeals might well conclude that the issue should be referred to the Board for its expert views in the first instance.

This kind of original adjudication by this Court is not what litigants have a right to expect. Moreover, to decide questions which, as here, have not been raised in the petition for certiorari offends our own rules.[4] There will no doubt be cases where remand is not justified because the questions left open by the lower court are manifestly insubstantial. It seems to me that in such instances this Court should state that it is not remanding for that reason, instead of proceeding as a matter of course to decide the questions itself, either expressly or *sub silentio*. The latter procedure can only have a tendency to lead this Court, as here, to decide questions which it should not pass upon in the first instance, and in my opinion represents unsound judicial administration.

---

[4] Rule 23, 1 (c), Revised Rules.