Eddie WITTSTEIN et al., Plaintiffs-Appellees,

v.

AMERICAN FEDERATION OF MUSICIANS OF the UNITED STATES AND CANADA, Defendant-Appellant.

Julius SCHWARTZ et al., Plaintiffs-Appellees,

v.

ASSOCIATED MUSICIANS OF GREATER NEW YORK, LOCAL 802, AMERICAN FEDERATION OF MUSICIANS OF the UNITED STATES AND CANADA, Defendant-Appellant.

Nos. 246, 247, Dockets 28563, 28564.

United States Court of Appeals Second Circuit.

Argued Nov. 20, 1963.

Decided Dec. 18, 1963.

Dissenting Opinion Dec. 23, 1963.

Certiorari Granted March 9, 1964.

See 84 S.Ct. 798.

Marshall, Circuit Judge, dissented.

Godfrey P. Schmidt, New York City, for plaintiffs-appellees.

Emanuel Dannett, New York City, (Henry Kaiser and George Kaufmann, Washington, D. C., Jerome H. Adler, Herbert D. Schwartzman, Eugene Mittelman, and McGoldrick, Dannett, Horowitz & Golub, New York City, for defendant-appellant, American Federation of Musicians of the United States and Canada and David I. Ashe and Ashe & Rifkin, New York City, for defendant-appellant, Associated Musicians of Greater New York, Local 802, on the brief), for defendant-appellant, American Federation of Musicians of the United States and Canada, and defendant-appellant, Associated Musicians of Greater New York, Local 802.

Before MEDINA, WATERMAN and MARSHALL, Circuit Judges.

MEDINA, Circuit Judge.

As a result of our decision in Cutler v. American Federation of Musicians, 2 Cir., 1963, 316 F.2d 546, cert. denied, December 9, 1963, 84 S.Ct. 346, holding invalid the 10 per cent travelling surcharge imposed by certain provisions of the By-laws and Constitution of the Federation, an attempt was made to supply funds deemed necessary to take the place of the travelling surcharge by presenting for adoption at the ensuing Annual Convention of the Federation held in June, 1963, a resolution increasing per capita membership dues. When this resolution was passed these consolidated actions were brought by individual members of the unions to challenge the validity of the

dues increase on the ground that it violated the provisions of the Labor-Management Reporting and Disclosure Act of 1959, Section 101(a) (3) (B), 29 U.S.C. § 411(a) (3) (B). Judge Levet sustained this contention and held the action of the Convention in passing the increase of dues resolution void, on the ground that the Act required that each delegate cast only one vote, whereas the roll call method pursued at the Convention allowed the votes of the delegates to be weighted in such manner as to count as votes by the number of members in the locals represented by the delegates, and not by counting the vote of each delegate as a single vote. His opinion, Wittstein v. American Federation of Musicians, S.D.N.Y., 1963, is reported at 223 F.Supp. 27. Numerous other miscellaneous points are raised, especially in the brief of appellees, but, as we agree with Judge Levet on the principal question of law involved, we do not find it necessary to discuss the other points.

▮ The two cases were disposed of by summary judgments for plaintiffs. In Wittstein, et al. v. American Federation of Musicians of the United States and Canada the judgment is final. In Schwartz, et al. v. Associated Musicians of Greater New York, Local 802, American Federation of Musicians of the United States and Canada, only the first count of the complaint was dismissed, as other questions than those discussed in this opinion were raised, but Judge Levet made the customary finding and order prescribed by Rule 54(b) of the Federal Rules of Procedure. Thus appeals by the Federation and by Local 802 are properly before us.

The controlling language of the 1959 Act, Section 101(a) (3) (B), 29 U.S.C. § 411(a) (3) (B), applicable specifically to "Dues, Initiation Fees, and Assessments" provides that rates of dues and initiation fees payable by union members shall not be increased except

"(B) in the case of a labor organization, other than a local labor organization or a federation of national or international labor organizations (i) by majority vote of the delegates voting at a regular convention, or at a special convention of such labor organization held upon not less than thirty days' written notice to the principal office of each local or constituent labor organization entitled to such notice, or (ii) by majority vote of the members in good standing of such labor organization voting in a membership referendum conducted by secret ballot, or (iii) by majority vote of the members of the executive board or similar governing body of such labor organization, pursuant to express authority contained in the constitution and by-laws of such labor organization: *Provided,* That such action on the part of the executive board or similar governing body shall be effective only until the next regular convention of such labor organization."

These provisions apply to the Federation, which is a labor organization other than a local labor organization or a federation of national or international labor organizations within the meaning of the Act, and the Federation is conceded to be a labor organization in an industry affecting commerce as defined in Section 3(i) of the Act, 29 U.S.C. § 402(i).

Article 5 of the Federation's Constitution contains the basic rules governing "Representation and Delegates," as follows:

"All Locals of this Federation of one hundred and fifty members or less shall be entitled to one delegate. All Locals shall be entitled to one delegate for each one hundred members or a major fraction thereof, not exceeding three delegates for any one Local, but each Local shall be entitled to one vote for each one hundred or major fraction thereof, but no Local shall cast more than ten votes, and the number each Local is entitled to shall be computed from the last report made on January 1st before the convention by the Local,

according to the books of the Treasurer. On questions affecting a change in the laws, each Local may, upon roll call, cast as many votes as it has members, as per book of the Treasurer, A. F. of M. All laws so passed shall be referred to a convention committee consisting of the Executive Board, A. F. of M., and chairmen of all committees, who may sanction or veto same, their action to be final. Roll call shall be demandable and had under this Article on demand of ten delegates or five Locals."

And the By-laws, in Article 28, relating to Convention Proceedings and the order of business at such conventions, prescribe

"Section 2. For Rules of Order, Robert's Revised Manual shall be the guide unless otherwise provided, and the manner of voting shall be viva voce, unless otherwise ordered. The vote at elections or the vote on roll call shall be in accordance with Article V of the Constitution."

The procedure at the June, 1963 Convention followed this pattern to the letter. We find nothing to support appellees' protestations to the contrary. Two voice votes of the delegates were inconclusive, there was a demand by five locals or more for a roll call. At the roll call the votes of the delegates were weighted in such fashion as to record in favor of or against the resolution not the number of delegates but the number of members of the local represented by the delegates. Thus Local 802, represented by two delegates,[1] cast 28,438 votes against the resolution.[2]

As we read the Constitution and the By-laws, the decisive vote was required to be by roll call, on proper demand, and such a demand must be complied with, irrespective of the result of any prior voice or standing vote. Thus, even if the voice vote had been clearly one way or the other, and even if a standing vote thereafter taken had been equally plain for all to see, the roll call, on proper demand, would decide the issue. Otherwise the provisions of the Constitution and By-laws make no sense. Indeed, we have no reason to doubt that a proper demand for a roll call would have to be acceded to, even if made prior to the taking of any voice or standing vote.

Moreover, as appellants claim to be the case, the weighted voting is to all appearances the most "democratic" method, in the sense that each member is duly "represented," and it is a method of voting widely recognized as fair and proper by a number of unions. Not only are similar provisions to be found, with some variations of detail, in many representative union constitutions or by-laws, but it may fairly be said that the passage of the Labor-Management Reporting and Disclosure Act of 1959 was not brought about by any abuses found to have flourished under the aegis of the weighted voting system.

■■ We think what we have just said clears the air. We may now leave aside confusing irrelevancies and digressions and address ourselves to the simple, central issue: in the context of Section 101(a) (3) (B), 29 U.S.C. § 411(a) (3) (B), do the words "by majority vote of the delegates voting at a regular convention" mean one vote for each delegate?

As we are unable to perceive any other meaning attributable to the phrase, we hold: that each delegate at the 1963 Convention was entitled to one vote, no more, no less; that the resolution as passed was void, as violative of the plain requirements of the Act; and that the judgments appealed from must be affirmed.

The Act thus construed does not "virtually disenfranchise thousands of appellants' members" as the statute pro-

---

1. Local 802 was entitled under the Federation's Constitution to three delegates.

2. As not affecting the result, in the view we take of the applicable law, we do not discuss the split or duplicate votes cast at the 1963 Convention.

vides an alternative method of increasing dues by referendum, in which case the issue would be determined "by majority vote of the members," rather than "by majority vote of the delegates." Voting by stockholders of corporations is not, we think, an analogous situation. The same is true of methods prescribed by the federal or state constitutions or by legislation for the nomination or election of various public officials. Nor is it of significance that Title IV of the Act apparently permits the election of officers of unions by a weighted vote. The considerations the Congress may well have thought relevant to election of officers on the one hand, and raising dues at regular conventions, on the other, are not the same.

■ True it is that the Bill of Rights, so-called, in Section 101(a) (1), 29 U.S. C. § 411(a) (1), is "subject to reasonable rules and regulations in such organization's constitution and bylaws." And Section 103, 29 U.S.C. § 413, provides that nothing in Title I, "Bill of Rights of Members of Labor Organizations," shall limit the rights or remedies of members of unions under any State or Federal law, "or under the constitution and bylaws of any labor organization." But these provisions are of no avail to appellants, for two reasons. In the first place, Section 101(b), the very Section prescribing a "majority vote of the delegates voting at a regular convention" for an increase of dues, states: "Any provision of the constitution and bylaws of any labor organization which is inconsistent with this section shall be of no force and effect." In the second place, no requirement of a weighted vote could possibly be considered "reasonable," in the face of a statutory requirement of one vote for each delegate.

■ It is surprising that appellants should also rely upon the McClellan Bill and the Barden Bill, each of which specifically allowed weighted voting. S. 1137, 86th Cong. 1st Sess., Section 104(2) (1959); H. R. 4473, 86th Cong. 1st Sess.,

Section 102(b) (3) (1959). These bills were rejected.

Everyone seems to agree that the Labor-Management Reporting and Disclosure Act was "to insure union democracy," and that the intended beneficiary of the provisions of the Act is the union member. O'Donoghue, The Bill of Rights—Responsibilities of Its Beneficiaries, 48 Geo. L. J. 257 (1959). But the natural inference to be drawn from a reading of the Act, especially the portion relating to increases of dues, initiation fees, and assessments, is that the specific enumeration of methods of proposing and voting for such increases is intended to be exclusive. One need not be steeped in the historical data affecting the uses and abuses of labor organizations to realize that any complicated system of proposing and voting for increases in dues, initiation fees and assessments is subject to manipulation, to the disadvantage of the individual union member. We hold that the simple, unambiguous requirements set forth in Section 101(a) (3) (B) were intended to mean just what they appear on their face to mean, and that in this way the Congress intended to prevent future skulduggery of every possible character and description in the fertile field of increasing dues, initiation fees and assessments, even if no particular abuses in the matter of weighted voting for such increases had been proved.

Other contentions by the respective parties have not been overlooked.

Affirmed.

MARSHALL, Circuit Judge, dissents.

MARSHALL, Circuit Judge (dissenting).

I must respectfully dissent from the opinion of my brothers. Like them, I recognize that a weighted voting system appeared in many representative union constitutions prior to the enactment of the Labor-Management Reporting and Disclosure Act of 1959,[1] and that the

1. 73 Stat. 522, 29 U.S.C. § 401 et seq.

statutory provision in question "was not brought about by any abuses found to have flourished under the aegis of that system."[2] My disagreement is only with the conclusion that the words "by majority vote of the delegates voting" were intended and must be construed to invalidate this common and concededly fair method of delegate voting at union conventions, insofar as it is used to approve dues increases.[3]

I think it is fair to say that the majority decision rests principally on the so-called "plain meaning" rule, i. e., that the statutory phrase is capable of but one interpretation. My brethren recognize, as noted above, that elimination of the weighted voting system was not consciously put forward as a goal of the Act, whose main thrust was to correct the flagrant abuses of power by some union officials which had been uncovered by extensive Congressional investigations. Nor does any reason readily suggest itself for barring the weighted ballot system in connection with dues increases voted at union conventions but in no other respect. It is clear that, with regard to election of officers and, indeed, any other action taken at these conventions, the system is perfectly acceptable. Cf. § 401 (f) of the Act, 29 U.S.C. § 481(f). I can find no support for the majority's suggestion that dues increases are a particularly "fertile field" for "skulduggery," to which an especially strict standard should be applied.

We are left then, with the "plain meaning" rule as the only real basis for the majority decision. Conceding that the crucial phrase, taken in isolation, most naturally bears the majority's interpretation of it, I do not believe that any other reading is absolutely barred. The term used is "majority vote of the delegates voting," not "vote of a majority of the delegates voting." It bears the interpretation, perhaps not without some strain, that delegates may have differing voting strength, depending on the size of the locals which they represent. Where there are compelling reasons to give such interpretation, and none to give the more apparent one, it is open to us to do so. The plain meaning rule, after all, "is rather an axiom of experience than a rule of law, and does not preclude consideration of persuasive evidence if it exists." Boston Sand & Gravel Co. v. United States, 278 U.S. 41, 48, 49 S.Ct. 52, 54, 73 L.Ed. 170 (1928) (Holmes, J.). Again, it has been said that "words are inexact tools at best, and for that reason there is wisely no rule of law forbidding resort to explanatory legislative history no matter how clear the words may appear on 'superficial examination.'" Harrison v. Northern Trust Co., 317 U.S. 476, 479, 63 S.Ct. 361, 363, 87 L.Ed. 407 (1943). Of course, the "rule" has an important place as a canon of construction and I do not wish to contest the general proposition that the language actually chosen is the most reliable guide to the legislature's intention. But it is a myopic view, and one oblivious of precedent, that shuts us off from consideration of the purposes intended to be served by legislation in a case where the "plain meaning" rule leads to incongruous and even unjust results. See, e. g., United States v. American Trucking Assn., 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940); United States v. Dickerson, 310 U.S. 554, 60 S.Ct. 1034, 84 L.Ed. 1356 (1940); United States v. N. E. Rosenblum Truck Lines, 315 U.S. 50, 62 S.Ct. 445, 86 L.Ed.

---

2. See Leiserson, American Trade Union Democracy 122 (1959). "Though a representative body, the typical convention is identified with the union itself as if it were a general meeting of all the members. On roll call votes, the full membership of each local union is voted by its representatives in some conventions. In most, the same plebiscite effect is achieved by the delegates from each local casting a fixed number of votes proportionate to its membership."

3. Throughout this opinion, the word "weighted" is restricted to the method whereby delegates vote proportionate to the membership of the locals they represent. Nothing herein is to be construed as a blanket approval of all methods of weighted voting.

671 (1942); N. L. R. B. v. Lion Oil Co., 352 U.S. 282, 77 S.Ct. 330, 1 L.Ed.2d 331 (1957); J. C. Penney Co. v. Commissioner, 312 F.2d 65 (2 Cir.1962).

Of the many provisions of the LMRDA, section 101(a) (3) was one of the least controversial. It first appeared in an amendment offered by Senator McClellan on the Senate floor to add a "Bill of Rights" to the labor reform bill which had been reported by the Senate Committee on Labor and Public Welfare (S. 1555, 86th Cong., 1st Sess.). See 105 Daily Cong. Record 5810 (April 22, 1959), reprinted in 2 N. L. R. B. Legislative History of the Labor-Management Reporting Disclosure Act of 1959, 1102 (1959).[4] Senator McClellan's amendment provided that in the case of a national labor organization the rates of dues should not be changed, and no new dues, initiation fees or assessments imposed except by a majority vote of the delegates present at a duly constituted convention. Senator McClellan explaining this part of his amendment, said only that

> In other words, the dues or the initiation fees cannot be increased, as they have been in certain instances. For example, if certain jobs come along, the initiation fees are hiked up. Some of the new members get the new jobs, and the old members who have been members for a long time, get no assignment to work. That has happened in my State, and it is happening in other States, too. It is not right; it is wrong. 2 Leg. Hist. 1104.

There was no further floor discussion of this part of the amendment prior to the vote on it. On April 24, 1959, Senator Kuchel offered an amended "Bill of Rights" title which reworded most of the provisions to eliminate ambiguities and overly broad language in some of them. The paragraph dealing with dues increases was amended to provide three methods of increasing dues: (1) majority vote of the members at a meeting or

(2) a referendum through the mails or (3) in the case of a national or international organization, "by majority vote" at a regular or duly constituted special convention. Senator Kuchel offered no explanation of the changes in this provision, indicating that it was taken "almost verbatim from that part of the McClellan amendment which was applicable * * *" 2 Leg. Hist. 1232. Again, there was no further floor debate until the revised "Bill of Rights" was passed.

The bill then moved to the House. As is well known, three versions of the Labor Reform Bill, H. R. 8342 (the Elliott Bill, reported by the Committee on Education and Labor), H. R. 8400 (the Landrum-Griffin Bill, which was ultimately adopted on the floor) and H. R. 8490 (the Shelley Bill, generally favored by organized labor) were the most important ones considered. The relevant language of all three bills was identical, and was the language finally enacted into law. The principal changes from the Senate version were that only dues increases, rather than all changes in dues, were required to be submitted to membership action, that a referendum vote was specifically authorized for both local and national labor organizations, and that executive boards of national unions were authorized to make interim increases until the next regular convention of the organization. These changes were apparently made in response to criticisms of the Senate Bill voiced by representatives of organized labor at hearings before the House Committee on Education and Labor.

The purpose of the section was expressed in various ways, but emphasis was always placed on ensuring members the "right to participate in deciding upon the rates of dues" (H.Rep. No. 741, 86th Cong., 1st Sess. 7); U. S. Code Congressional and Administrative News 1959, p. 2429; or "to control membership and other fees charged by the union" (id. at 78); or to "protect against exorbitant

---

4. Hereinafter cited as Leg.Hist.

rates or arbitrary changes in dues and fees." 2 Leg.Hist. 1520 (remarks of Rep. Griffin).

It seems to me clear that Congress intended merely to assure that dues increases could not be imposed by irresponsible or arbitrary union leaders not answerable in any way to the membership at large. It did not set out to dictate to unions a particular method for voting by delegates at national conventions, and, especially, did not have any desire to foreclose national unions from giving more weight to their larger locals on this question. Under the majority's interpretation of this provision, the only way a national union could do this, and still give even small locals at least one delegate, would often be to increase the number of delegates and the expense of holding conventions, out of all manageable proportions. In the instant case the size of Federation locals varied from 20 (Local 629, Waupaca, Wisc.) to 28,000 (Local 802, New York City), so that a fully proportional system of representation would require some 14,000 delegates in an organization with 280,000 members.

In summary, then, I am most reluctant to employ the "plain meaning" rule here as a means of preventing the use of a perfectly normal and accepted means of voting at union conventions, especially since there is no evidence that Congress felt this method was subject to any abuse whatsoever. It is noteworthy that none of the Congressmen and Senators who discussed the bill ever adverted to this problem, or indicated in any way that a change in the practice was desirable. The same is true of the many commentators who have exhaustively analyzed the provisions of the Act, from every possible standpoint. The term "majority vote of the delegates voting" is susceptible to a construction which would allow delegates' votes to be weighted in accordance with the strength of the different locals they represent. We ought to accept that construction, and reverse the summary judgment herein.