Ivan C. McLEOD, Regional Director of the Second Region of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

COMPRESSED AIR, FOUNDATION, TUNNEL, CAISSON, SUBWAY, COFFERDAM, SEWER CONSTRUCTION WORKERS, LOCAL NO. 147 OF NEW YORK, NEW JERSEY STATES AND VICINITY, AFL–CIO, Respondent.

No. 61–C–350.

United States District Court
E. D. New York.
June 6, 1961.

Jacques Schurre, Washington, D. C., for petitioner.

Paul O'Dwyer & I. Philip Sipser, New York City, for respondent; I. Philip Sipser, New York City, and John S. Williamson, Jr., New York City, of counsel.

Proskauer, Rose, Goetz & Mendelsohn, New York City, for charging petitioner; Saul G. Kramer, and Nevius, Jarvis & Pilz, J. E. Davey, Jr., New York City, of counsel.

BARTELS, District Judge.

Proceeding brought by petitioner, Regional Director of the Second District of the National Labor Relations Board (referred to as the "Board"), for an injunction pursuant to Section 10(j) of the National Labor Relations Act, 29 U.S. C.A. § 160(j) (referred to as the "Act"), on the ground that he has reasonable cause to believe that respondent has violated Sections 8(b) (3) and 8(d) of the Act, 29 U.S.C.A. § 158(b) (3), (d). Respondent ceased work on the construction of a sewer located on Kent Avenue in the Borough of Brooklyn, City of New York, and as a result of the work stoppage it is alleged that the roadway over the sewer tunnel is in danger of collapsing into the tunnel. Because thereof the Board issued a complaint pursuant to Section 10(b) of the Act and now seeks an injunction.

Section 8(b) (3) provides that it shall be an unfair labor practice for a labor organization or its agents to refuse to bargain collectively with an employer. The term "bargain collectively" is defined in Section 8(d) of the Act, and requires, among other things, that when a collective bargaining agreement is in effect between the parties there can be no modification or termination of the agreement unless certain procedures are followed, including notification by the party seeking modification or termination to the other party, as well as the

Federal Mediation and Conciliation Service and the state mediation agency, as prescribed therein.

■ On an application of this nature the Court may not determine whether or not the Act has been violated as charged since any determination on the merits must be made by the Board. The sole duty of the Court is to ascertain whether the Regional Director had a reasonable cause to believe that the Act has been violated. See N. L. R. B. v. Denver Building & Construction Trades Council, 1951, 341 U.S. 675, 681–683, 71 S.Ct. 943, 95 L.Ed. 1284. The pivotal question here is whether there was an existing dispute as to modification or termination of the existing agreement or whether the dispute concerned the execution of a contract to be effective in the future with respect to which a strike under the existing agreement might not constitute an unfair labor practice.

### Facts

The charging party herein is a joint venture, composed of Andrew Catapano Co., Inc. and Grow Construction Co., Inc. (referred to as "C–G"). Respondent has been and is the exclusive representative of C–G's employees within the meaning of Section 9(a) of the Act, 29 U.S.C.A. § 159(a). It is conceded that the Court has jurisdiction over this dispute.

On or about December 4, 1957 respondent and C–G executed a collective bargaining agreement, which was modified by the parties on or about November 1, 1958, and further modified on or about September 17, 1959 as follows:

"The Agreement as hereby modified shall be reopened as to wages to be paid after August 15, 1960 if negotiations therefor shall be commenced not later than June 1, 1960. If the parties are unable to come to an agreement by August 1, 1960, either party shall have the option to terminate (as of August 15, 1960) the Agreement as modified hereby."

Agreements between contractors and bargaining agents of their employees are generally, in this industry, on a job basis; therefore, the 1959 agreement was a contract covering all work on

"the Kent Avenue Intercepting Sewer Contracts 2A and 2B and also any and all contracts involving tunnel construction in the area within the jurisdiction of the union which may be undertaken by the Companies or either of them prior to August 15, 1960 or during any extension of the time of this Agreement."

The agreement in question covers an original contract and modifications thereto between C–G and the City of New York for the construction of a sewer in Brooklyn, N. Y. and the work in progress at all times relevant hereto was under the agreement.

On or about May 25, 1960 respondent served written notice on C–G and other employers in the industry of its desire to commence joint wage negotiations. The notice to C–G invoked "the reopening clause of our contract". In June, 1960 a wage package was offered by C–G, which was rejected by the Union (Tr. p. 76). Several meetings were held by the parties but no agreement was reached. In February, 1961 C–G requested a meeting with the Union at which C–G asserted that it wished to bid on a construction job involving the Sixth Avenue subway line and wanted to know where it "stood with the union" (Tr. p. 77). The C–G offer was for a 65¢ wage package and a continuation of the terms of the present agreement until July, 1963. This proposal was rejected by the Union, which proposed (i) a $3 wage package and (ii) execution of a contract identical with the contract between respondent and Poirier & McLane (the "P–M contract"). The Union indicated that if C–G would execute the P–M contract, it would "look favorably" upon C–G's offer for a contract to run through 1963 and a 65¢ wage package. The Union at this time did not wish to negotiate individually with C–G but wished all of the members of the contractors' association to execute the P–M contract. There appears to have been some dispute

within the Union as to whether or not the offer had or had not been rejected.

On February 28, 1961 the Union informed C–G that unless the P–M contract was signed work on C–G's project, then manned by respondent, would stop "for lack of a contract" (Petitioner's Exhibit 4). Two further meetings were held in March, without result. On April 3, 1961 the Union again met with C–G. According to the testimony, the negotiating committee had considered the discussions with regard to the P–M contract as being discussions of contracts to cover future work. At the meeting, however, the respondent's business agent, Brian Finney, and its president, Timothy Murphy, stated that their position was that the P–M contract would apply to work *then in progress on the Kent Avenue sewer.* At midnight on April 3, 1961 the respondent ceased work on the Kent Avenue sewer, informing C–G by telegram that the stoppage was the result of a "lack of contract" (Petitioner's Exhibit 8).

No notice was sent to the Federal Mediation and Conciliation Service or the New York State Mediation Board pursuant to Section 8(d) (3). The City of New York, by telegram (Petitioner's Exhibit 7) informed C–G that the failure to finish the concreting of the tunnel has resulted in an unsafe condition, endangering water mains, sewers and power cables in the street.

The charge of the Board that respondent has violated Section 8(b) (3) of the Act by failing to bargain in good faith is predicated upon respondent's alleged failure to comply with the notice requirements of Section 8(d) of the Act with regard to modification of an agreement. The respondent counters that based upon the evidence there was no attempt to modify an existing agreement, but on the contrary the negotiations concerned a future contract for future work and hence while the strike might be a breach of the "no strike clause" of the agreement, it was in no way a "modification" of an existing agreement subject to the requirements of Section 8(d). As a fur-

ther defense it asserts any claim of termination of the agreement in violation of Section 8(d) was not pleaded and consequently there can be no basis for an injunction. In reply to the latter claim the Board argues that while the negotiations between the employer and the Union originated over a modification of an existing agreement, the subsequent conduct of the Union could be construed as an attempt to effect either a modification or a termination of the agreement without requisite notice and, hence, in either case violative of Section 8(d). At the end of the hearing the Board moved to conform the petition to the evidence to include a termination in violation of Section 8(d).

## Modification

The petition herein is predicated upon the failure of respondent to comply with the provisions of Section 8(d) with regard to modification of a contract. If the strike were solely for the purpose of negotiating a new contract to operate *in futuro,* without affecting the terms and conditions of an existing agreement, it would not be proscribed as an unfair labor practice because it would be neither a modification nor a termination of an existing agreement (cf. Broward County Carpenters' District Council, 1959, 122 NLRB 1008). See N. L. R. B. v. Insurance Agents' International Union, 1960, 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454; Mastro Plastics Corp. v. N. L. R. B., 1956, 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309; N. L. R. B. v. Lion Oil Co., 1957, 352 U.S. 282, 77 S.Ct. 330, 1 L.Ed. 2d 331. Respondent urges that Lion Oil is determinative of the present application. In that case all the notices required by Sections 8(d) (1) and 8(d) (3) had been given, the Court deciding that the term "expiration date" as used in Section 8(d) (1) encompasses both the expiration date after the 60-day notice to modify as well as the expiration date after the 60-day notice to terminate. It has no application to this case where the notice required by Section 8(d) (3) was not given.

From the testimony it is apparent that the respondent on April 3, 1961 insisted upon the immediate execution of the P–M contract to apply to the work covered by the existing agreement. From the letter of February 28, 1961, referring to a work stoppage "for lack of a contract" it may be inferred that the P–M contract was intended by respondent to modify the existing agreement. It must be remembered that all the negotiations between the respondent and C–G arose out of the wage reopening clause of the agreement as amended, pursuant to which notice was given by respondent on or about May 25, 1960 in compliance with the requirements of Section 8(d) (1). In the course of the wage reopener the problem of future contracts was also raised, and discussions of wages became inexorably entwined with the negotiation of terms and conditions of work for future contracts. At no time was there a bi-lateral agreement as to modification of the existing agreement with regard to wages alone. Although the amount of wages may have been agreed upon, no effective date for the increase was stipulated because the wage agreement was apparently conditioned upon the execution of either the C–G proposal or the P–M contract. Consequently there never was a conclusion of the wage discussions pursuant to the reopening clause of the contract. This result is not altered by the fact that C–G granted a unilateral wage increase in March, 1961. The procedure for modification was invoked, but modification was never effected and on April 3, 1961 the respondent demanded the P–M contract as a condition of continuing under the existing agreement.

■ The Court concludes therefore that the Regional Director had reasonable cause to believe that the work stoppage was not for the purpose of compelling the execution of a new contract to cover future work, but was a work stoppage arising out of a dispute over the modification of an existing agreement. It was not, as argued by respondent, simply a breach of contract. It was more,

it was a violation of the Act. The mediation agencies were never notified by respondent concerning the existence of a dispute with respect to the proposed modifications and, hence, there was reasonable cause to believe that there was a failure to bargain in good faith within the meaning of Section 8(d), constituting an unfair labor practice which justified the action of the Regional Director.

### Termination

■ On February 28, and again on April 4 the Union insisted that the work was stopped "for lack of a contract". If this means for "lack of the P–M contract" then it is reasonable to assume that it refers to the failure of C–G to modify the existing agreement by adoption of the P–M contract (see discussion under "Modification", supra). If it means "for lack of a present contract", which is perhaps more probable, then it refers to the termination of the existing agreement. Thus the possibilities of the two theories revolve around the same operative facts. From this, the Regional Director might reasonably infer that the respondent, without the requisite notice, either under Section 8(d) (1) or Section 8(d) (3), terminated the existing labor agreement. Termination without such notice is failure to bargain in good faith within the meaning of Section 8(b) (3), and is an unfair labor practice. Any finding of a violation of Section 8(b) (3) by termination depends, however, upon the success of petitioner's motion to conform the petition to the evidence adduced at the hearing.

### Amendment

■ Respondent asserts that no amendment to the complaint may be allowed, since the change of the theory thereof from a "modification violation" to a "termination violation" renders the petition jurisdictionally defective. The basis of the assertion is that petitioner must have reasonable cause to believe that there has been a violation of the Act, and unless the violation is charged, there can be no "reasonable cause".

484

The Court does not believe this contention is tenable under the existing circumstances. The operative facts of this case are the same, whether there was a modification of the existing agreement or a termination thereof. The record of negotiations and communications is identical in each case. There was in either event a failure to notify the proper mediation authorities. In the instant case the respondent, at least on April 3, 1961, proposed that the present contract be superseded by a new contract, the P–M contract. Thus, if the P–M contract was to take effect during the existence of the present agreement, the P–M contract was a "modification" of the existing agreement. If the P–M contract was to become effective only in the future, then the respondent's action in ceasing work under the existing agreement for "lack of a contract" was a "termination" of the existing agreement. This is more a question of theory than of fact, since under either of the two approaches the basic evidence is the same. The petition sets forth the essential facts which could support either of the above violations. The failure to label the violation in the petition as a "termination" did not eliminate reasonable cause to believe that such a violation existed under either theory. Further, such failure to include both theories could not prejudice the respondent. The facts and not the legal theories are controlling, particularly when the theories may be equivocal. See Nagler v. Admiral Corporation, 2 Cir., 1957, 248 F.2d 319, 328. Since there has been no failure to fully investigate, the case does not fall within the compass of either Brown for and on Behalf of National Labor Relations Board v. Department & Specialty Store Employees Union, D.C. Cal.1960, 187 F.Supp. 619, or Madden v. International Organization of Masters, Mates & Pilots, D.C.Ill.1958, 166 F.Supp. 862, affirmed 7 Cir., 259 F.2d 297. Inasmuch as the evidence adduced supports both theories the Board had reason to act under either or both. Accordingly, the application to amend the petition to conform to the proof will be granted.

The relief requested is based upon reasonable cause and is necessary for the protection of the public interest and the preservation of the status quo. Petition granted. Submit findings of fact and conclusions of law within three (3) days.