PETROLEUM EXPLORATION et al. v. COMMISSIONER OF INTERNAL REVENUE.

No. 6317.

United States Court of Appeals Fourth Circuit.

Argued Oct. 8, 1951.

Decided Nov. 29, 1951.

1. Martin v. Wyeth, Inc., D.C., 96 F.Supp. 689.

W. J. Brennan, Sisterville, W. Va. (Charles W. Moxley, W. M. Drennen and Jackson, Kelly, Morrison & Moxley all of Charleston, W. Va., on the brief) for petitioners.

Melva M. Graney, Special Asst. to the Atty. Gen. (Theron Lamar Caudle, Asst. Atty. Gen. and Ellis N. Slack, Special Asst. to the Atty. Gen., on brief) for respondent.

Before PARKER and DOBIE, Circuit Judges, and WYCHE, District Judge.

WYCHE, District Judge.

Taxpayers Petroleum Exploration and The Wiser Oil Company seek to reverse decisions of the Tax Court, finding deficiencies in excess profits taxes against them. A separate decision was entered by the Tax Court in each case. The appeals have been consolidated for hearing in this court.

Two questions are presented for decision: (1) Whether the interest in an instrument designated as "Oil and Gas Lease", which taxpayers sold on January 31, 1939, was held by them from the time of the execution of the instrument in their favor, or only from the time oil was discovered on the premises covered by the instrument. (2) Whether the taxpayer Petroleum Exploration and its subsidiary Southern Petroleum Exploration constitute a "controlled group" within the meaning of Section 713(g)(5) of the Internal Revenue Code, 26 U.S.C.A. § 713(g)(5).

As to the first question, the facts are substantially as follows: Laura Maxwell, as

"Lessor", for and in consideration of $35 cash in hand paid, executed and delivered to The Wiser Oil Company, as "Lessee", an instrument dated March 2, 1937, designated as "Oil and Gas Lease" on 10 acres, 40 acres and 20 acres, aggregating 70 acres, in Marion County, Illinois. It granted, demised, leased and let the 70 acres for the sole and only purpose of mining and operating for oil and gas for the optional term of ten years from date, and for so long thereafter as oil or gas was produced from the premises. It provided that unless a well was commenced thereon, or the sum of $17.50 was paid by the "Lessee" to the "Lessor" at or before the first or any subsequent anniversary thereof, it would terminate as to both parties, that one-eighth of all oil produced and saved should be delivered to the credit of the "Lessor", free of cost. In the words of the instrument, it provided: "If no well be commenced on said land on or before the 2nd day of March, 1938, this lease shall terminate as to both parties, unless the Lessee shall on or before that date pay or tender to the Lessor * * * the sum of Seventeen & 50/100 Dollars, which shall operate as a rental and cover the privilege of deferring the commencement of a well for twelve (12) months from said date. * * * In like manner and upon like payments or tenders, the commencement of a well may be further deferred for like periods of the same number of months successively. And it is understood and agreed that the consideration first recited herein, the down payment, covers not only the privilege granted to the date when said first rental is payable as aforesaid, but also the Lessee's option of extending that period as aforesaid, and any and all other rights conferred."

No well having been commenced on the premises on February 23, 1938, The Wiser Oil Company paid Laura Maxwell the sum of $17.50 to renew its option to explore the premises for an additional twelve months from March 2, 1938, taxpayers contributing the amount in equal portions.

On August 24, 1938, The Wiser Oil Company entered into an agreement with Kingwood Oil Company, whereby the latter agreed to drill a test well on the 20 acres.

Pursuant to this agreement, Kingwood Oil Company located this well on August 30, 1938, and completed it on September 14, 1938. Thereafter two additional wells were completed on the 20 acres, one September 24 and the other on October 6, 1938. Oil was found in all three of these wells, which were equipped for production, and oil produced therefrom. Production therefore commenced on September 22 and 30, and October 11, 1938, respectively. Pursuant to this agreement, The Wiser Oil Company assigned one-half of its interest in the 20 acres to Kingwood Oil Company on September 20, 1938.

On September 7, 1938, The Wiser Oil Company entered into a similar agreement with Kingwood Oil Company with respect to the 10 acres and 40 acres. Pursuant thereto, Kingwood Oil Company thereafter commenced one well on the 40 acres, and completed it on September 30, 1938; and two wells on the 10 acres, and completed them, one on October 14, and the other on October 20, 1938. Oil was found in all three of these wells, which were equipped for production, and oil produced therefrom. Production therefrom commenced on October 4, 24 and 26, 1938, respectively. Pursuant to this agreement, The Wiser Oil Company assigned one-half of its interest in the 10 acres and 40 acres to Kingwood Oil Company on January 5, 1939.

In the foregoing transactions The Wiser Oil Company was acting for the equal benefit of itself and Petroleum Exploration as joint adventurers.

Prior to and including January 31, 1939, when the property was sold to The Texas Company, 160,336.36 barrels of oil had been produced from the six wells. The portion thereof of taxpayer Petroleum Exploration and taxpayer The Wiser Oil Company was 35,073.74 barrels as to each, none of which was included in the sale of the property to The Texas Company.

On January 31, 1939, each of the taxpayers and the Kingwood Oil Company sold their interest in this oil-producing property, including the operating equipment, to The Texas Company. The gross sales price realized by each taxpayer was $138,112.50. Each had capitalized on its books the sum

of $4,688.73, exclusive of the $35.00 and $17.50 paid Laura Maxwell, which were currently charged off as rental expense. Against these capital charges each had taken depreciation in the sum of $3,159.33, leaving a capital gain to each of $136,583.10. In the preparation of their excess profits tax returns for the years involved in these proceedings, each taxpayer determined its excess profits credit based on income by including in its 1939 excess profits net income its gain from the sale above mentioned. The Commissioner excluded it in computing such excess profits credit. This exclusion formed the basis of deficiencies originally determined as heretofore mentioned.

In the oil industry, the principal bases upon which oil-producing properties are bought and sold are (a) the estimated recoverable reserves of oil in place; and (b) the expected rate of their recovery. There is no now known method of obtaining oil from a subterranean stratum other than by piercing it with a well drilled from the surface.

Under these facts the Tax Court held that what taxpayers sold on January 31, 1939, to The Texas Company was "held" by them since the execution of the "lease" on March 2, 1937, and that, therefore, their gain on the sale constituted long-term capital gain which is to be excluded from taxpayers' excess profits net income under Section 711(b)(1)(B) of the Internal Revenue Code, 26 U.S.C.A. § 711(b)(1)(B), for the purpose of computing each taxpayer's excess profits credit.

In reaching this conclusion the Tax Court followed the *ferae naturae* doctrine respecting the ownership of oil, that is, that the taxpayers never acquired any interest in the oil in place that might underlie the leased premises but only in such of it as was reduced to possession above ground; and that all the taxpayers had and sold was the "lease" acquired on March 2, 1937.

The Supreme Court has made it clear that, regardless of the form of a transaction and the recondite niceties of the local art of property and conveyancing, it will, to give a uniform application to a nationwide scheme of taxation, appraise the transaction according to its economic and practical consequences. Burnet v. Harmel, 1932, 287 U.S. 103, 53 S.Ct. 74, 77 L.Ed. 199; Anderson v. Helvering, 1940, 310 U.S. 404, 60 S.Ct. 952, 84 L.Ed. 1277; Rogers' Estate v. Helvering, 1943, 320 U.S. 410, 414, 64 S.Ct. 172, 88 L.Ed. 134.

Under the "lease", the right of the taxpayers was merely an option to explore the premises, and no estate, title or interest vested in them, in or to the oil in place on the premises covered by the "lease" prior to the discovery of such oil through drilling operations. When such oil was discovered on the leased premises through the drilling operations, a new property was brought into being, consisting of the oil in place beneath the surface of the premises. It was then that there was discovered the property interest. Based on modern scientific methods of which the court will take judicial notice, this property right and the extent of the oil discovered are subject to reasonably accurate scientific measurement so much so that such property is a customary source of barter and trade. No longer is it admissible to speak of such oil in place as *ferae naturate;* courts cannot close their eyes to scientific developments and established business concepts. If no oil had been found from the exploratory tests of the land, The Texas Company would not have paid such a substantial amount for the "lease".

The opinion of the Tax Court does not appraise the transaction according to its economic and practical consequences; it overlooks the fundamental economic event of the oil industry, that is, discovery; it does not take into consideration that the principal bases upon which oil-producing properties are bought and sold in the industry are the estimated recoverable reserves of oil in place and the expected rate of their recovery; that there is no now known method of obtaining oil from a subterranean stratum other than by piercing it with a well drilling from the surface; and it overlooks the fact that the extent of the oil discovered is subject to reasonably accurate scientific measurement, to the extent that such property is the customary source of big business transactions.

■ While the decisions of the state courts in oil-producing states are somewhat at variance, it is our opinion that the Pennsylvania Court in the case of Venture Oil Co. v. Fretts, 152 Pa. 451, 25 A. 732, 735, states the correct rule to be applied here, when it said: " * * * The title is inchoate, and for purposes of exploration only, until oil is found. If it is not found, no estate vests in the lessee, and his title, whatever it is, ends when the unsuccessful search is abandoned. If oil is found, then the right to produce becomes a vested right, and the lessee will be protected in exercising it in accordance with the terms and conditions of his contract." In the case at bar, with the discovery of oil, the consideration for extension of taxpayers' option to explore, the delay rentals, ceased; and the taxpayers acquired a new term for as long as the oil should be produced, for a new consideration, the one-eighth royalty thereof. The new term was a new property. Bonwit-Teller & Co. v. Commissioner, 2 Cir., 82 A.L.R. 325, 53 F.2d 381, 383. Although an option is "property" which if sold may result in a taxable gain; nevertheless, when the option is exercised a new "property" is "acquired".

■ Disregarding the conflicting rules of property of the several oil producing states respecting the time of passage of title to oil and, to give uniformity to Federal tax jurisprudence looking to the practical and economic consequences of the instant transaction, we must conclude that what was actually and really sold was the interest of each taxpayer in the oil in place which was not acquired earlier than when the oil was found.

The second question concerns only the taxpayer Petroleum Exploration. The facts are substantially as follows: On April 17, 1945, Petroleum Exploration received from Southern Petroleum Exploration $825,000 par value of the latter's preferred stock for $183,000 in cash and $642,000 of the notes of the latter held by the former, under the following circumstances: On April 17, 1945, Petroleum received, and on every subsequent day up to and including December 31, 1946, continued to hold, 8,250 shares of the preferred stock of Southern Petroleum

Exploration, which 8,250 shares constituted 75 per cent of the preferred stock outstanding. The adjustment basis (for determining loss upon sale or exchange) of such shares is $825,000. On April 17, 1945, Petroleum Exploration already held, and on every subsequent day up to and including December 31, 1946, continued to hold, 375 shares of common stock of Southern Petroleum Exploration, which shares had been acquired on April 1, 1925. Such 375 shares of common stock constituted 75 per cent of the common stock outstanding. The adjusted basis (for determining loss upon sale or exchange) of such shares is $18,750. At no time material hereto did any corporation whatever own as much as 50 per cent of Petroleum Exploration's stock. The result is a net capital reduction under Section 713 (g)(5) of the Internal Revenue Code, to be deducted from net income under Section 713(a)(1)(C) in computing excess profits net income for the purposes of the excess profits credit, if taxpayer Petroleum Exploration and Southern Petroleum Exploration are members of the same "controlled group" within the meaning of Section 713(g)(5).

The Tax Court held that taxpayer Petroleum Exploration and Southern Petroleum Exploration were members of the same "controlled group" within the meaning of the statute defining a controlled group. The Tax Court based its decision upon its prior decision in Morganton Full Fashioned Hosiery Co. v. Commissioner, 14 T.C. 695, where it concluded that under all the circumstances it is reasonable to conclude that the statutory definition of "controlled group" includes a situation where the taxpayer is in control, through stock ownership of but one corporation. We agree with the Tax Court in its reasoning that "The reason for and the purpose of the elimination of the cost of the stock of the subsidiary in the computation of daily invested capital would seem to be the prevention of a duplication of credit for what, in fact, is the same investment. This reason and purpose manifestly apply with equal force where the parent corporation had only one controlled subsidiary instead of two."

■ Furthermore, Treasury Regulations 112, Section 35.713–2(d) gives an illustra-

64

tion of the effect of Section 713(g) (5) involving only two corporations and therefore interpret the statutory definition as applying to a parent corporation with but one subsidiary. The statutory definition has remained unchanged. A reasonable construction by Treasury Regulations of an unchanged tax statute will be deemed to have received implied Congressional approval and will be given the force and effect of law. Helvering v. Winmill, 305 U.S. 79, 59 S.Ct. 45, 83 L.Ed. 52.

The decision of the Tax Court that the gains in questions were "long-term capital gains," excludable in computing the taxpayers' respective excess profits credits, is reversed, and the decision of the Tax Court that the acquisition by Petroleum Exploration of Southern Petroleum Exploration's preferred stock was a capital reduction, reducing the former's excess profits credit, is affirmed, and the cases are remanded to the Tax Court for further determination of each taxpayer's tax liability in conformity with this Court's decision.

Reversed in part.

Affirmed in part.