The BIRMINGHAM NEWS COMPANY, Plaintiff,

v.

George D. PATTERSON, Jr., District Director of Internal Revenue, Defendant.

Civ. A. No. 9585.

United States District Court
N. D. Alabama, S. D.

March 13, 1962.

Deramus & Johnston and Alfred M. Naff, Birmingham, Ala., for plaintiff.

Macon L. Weaver, U. S. Atty., and Malcolm L. Tanner, Asst. U. S. Atty., Birmingham, Ala., and Charles K. Rice, Asst. Atty. Gen., James P. Garland, Charles W. Mehaffy, and Thomas A. Frazier, Jr., Attorneys, Department of Justice, Washington, D. C., for defendant.

LYNNE, Chief Judge.

By this action the Birmingham News Company, a corporation, claims a refund of excess profits taxes in the amount of $15,358.10, with allowable interest there-

on, alleged to have been exacted erroneously by defendant and paid by plaintiff for the taxable year 1953. The genesis of this dispute was the purchase by plaintiff, on June 30, 1953, for a total consideration of $2,320,000, of all the outstanding stock of The Television Corporation (subsequently renamed "Alabama Broadcasting System, Inc."). At no time prior to June 30, 1953 did plaintiff own any stock of The Television Corporation or did The Television Corporation own any stock of plaintiff.

The sole question to be determined in this action is the proper construction of Sections 435(g) (4) (D) and 435(g) (6) of the Internal Revenue Code of 1939, enacted in the Excess Profits Tax Act of 1950 [1] (1939 Code, Secs. 430 through 474), which expired December 31, 1953. In its general structure and in many of its specific provisions the 1950 Act duplicates the Excess Profits Tax of 1940,[2] as amended (1939 Code, Secs. 710 through 752), which was repealed in 1945. Like its predecessors, the 1950 Act was designed basically to augment the revenue to meet military expenditures. It was, moreover, as its name implies, conceived of "as primarily a tax on increased profits due to the outbreak of hostilities and to large military expenditures." [3] To accomplish this aim of taxing only "excess" income, "normal" income is aggregated as the excess profits credit which is deducted from the excess profits net income; the remainder is the adjusted excess profits net income which is subject to the tax.[4] As provided in Section 434, the taxpayer may elect to compute the credit either on the basis of income under Section 435 or on the basis of invested capital under Section 436, whichever results in the lesser tax liability for the taxable year.[5] For the taxable year here in question, plaintiff chose to compute the credit under Section 435.

The excess profits credit based on income is provided by Section 435(a) (1) to consist of the *sum* of 83% of the average base period net income, 12% of the capital addition during certain base-period years, and 12% of the capital addition for the taxable year, *minus* 12% of the capital reduction for the taxable year. The primary component of the credit based on income is the average base period net income, which is, briefly, the average net income of the taxpayer's best three of the four base-period years—1946 through 1949, inclusive—subject to special adjustments for abnormalities, enlarged production capacity, and the like, during the base period.[6] The other components relate to an assumed return on capital investments which, because they were added during the latter base-period years or the excess profits taxable years, are reflected inadequately or not at all in the base-period earnings. The credit for base-period capital additions, computed under Section 435(f), consists of the assumed 12% return on one-half of the addition during 1948 and all of the addition during 1949.

Very generally stated, computation under Sections 435(g) (1) and (3) of the net capital addition for the taxable year requires first the aggregation of (1) amounts of money or property paid in

1. Ch. 1199, Tit. I, Sec. 101, 64 Stat. 1137.

2. Ch. 757, Tit. II, Sec. 201, 54 Stat. 975.

3. House Report No. 3142, 81st Cong., 2d Sess. 1951–1 Cum.Bull. 187, 188, U.S. Code Cong.Service 1950, p. 4029.

4. Sections 430(a) and 431, Internal Revenue Code of 1939. All code references hereinafter are to the Internal Revenue Code of 1939.

5. House Report No. 3142, 81st Cong., 2d Sess., 1951–1 Cum.Bull. 187, 188, U.S.

Code Cong.Service 1950, p. 4029, states that although "the primary emphasis [is] upon the average earnings base * * * it is believed that a minimum rate of return free of excess profits tax should be allowed taxpayers who happened to have poor earning experience in the base period. Therefore, taxpayers are offered an invested capital credit as an alternative which places a floor on the rate of return assured before the imposition of excess-profits taxes."

6. Secs. 435(b), (c), (d) & (e), 442–446.

for stock, or as paid-in surplus, or as a contribution to capital during the taxable year; (2) the amount of increase in equity capital (defined by Sec. 437(c) as total assets less total liabilities) from the beginning of the first excess profits taxable year to the beginning of the current taxable year; and (3) 75% of the amount of the increase in borrowed capital during the taxable year. Then, subtracted from the net capital addition thus derived is the amount of increase during the taxable year in certain assets designated in Section 440 and including stock in another corporation, the income from which is not taxed.

Conversely, the capital reduction for the taxable year, computed under Sections 435(g) (2) and (4), is the sum of (1) the amount of distributions during the taxable year to shareholders not out of earnings and profits of such year; (2) the amount of decrease in equity capital between the beginning of the first and the current excess profits taxable years; (3) 75% of the amount of the decrease in borrowed capital for the taxable year; (4) *the amount of increase in "controlled group inadmissible assets";* and (5) 75% of the amount of increase in loans between members of a controlled group.[7]

Our concern is with the fourth of the above-enumerated components of the capital reduction. In its pertinent part Section 435(g) (4) provides:

The daily capital reduction for any day of the taxable year shall, for the purposes of this section, be the sum of the following:

\* \* \* \* \* \*

(D) The amount determined under paragraph (6), relating to increase in certain inadmissible as-

sets by a member of a controlled group; \* \* \*.

Section 435(g) (6) provides in part:

If, on any day of the taxable year, the taxpayer and any one or more other corporations are members of the same controlled group, the amount added to the daily capital reduction under paragraph (4) (D) shall be whichever of the following amounts is the lesser:

(A) The excess of the aggregate of the adjusted basis (for determining gain upon sale or exchange) of stock in such other corporation (or if more than one, in such other corporations) held by the taxpayer at the beginning of such day over the aggregate of the adjusted basis \* \* \* of stock in such other corporation (or if more than one, in such other corporations) held by the taxpayer at the beginning of its first taxable year under this subchapter; \* \* \*.

\* \* \* \* \* \*

The increase in inadmissible assets for the taxable year shall, for the purposes of paragraph (1), be determined by reducing the inadmissible assets for such day by the amount by which the daily capital reduction for such day is increased under this paragraph.[8] As used in this paragraph, a controlled group means one or more chains of corporations connected through stock ownership with a common parent corporation, if (i) more than 50 per centum of the total combined voting power of all classes of stock entitled to vote, or more than 50 per centum of the total value of shares of all classes of stock, of each of the cor-

---

7. Although a step in the computation of net capital addition and reduction is the determination of *daily* additions and reductions, this factor has no significance in this case.

8. In other words, to the extent that stock in another corporation results in a capital

reduction under Section 435(g) (4) (D), it will not also constitute a Section 440 "inadmissible asset" which causes the decrease in the net capital addition under Section 435(g) (1) mentioned above, thus preventing a duplicate reduction on account of increased stock holdings.

porations (except the common parent corporation) is owned directly by one or more of the other corporations and (ii) the common parent corporation owns directly more than 50 per centum of the total combined voting power of all classes of stock entitled to vote, or more than 50 per centum of the total value of shares of all classes of stock, of at least one of the other corporations.

Plaintiff insists that its acquisition of all the outstanding stock of The Television Corporation in a single transaction was not an increase in controlled group inadmissible assets within the meaning of Sections 435(g) (4) (D) and (6). Plaintiff's argument is predicated on two alternative theories. First, it contends that both the express language and the purpose of these provisions contemplate that the controlled relationship exist prior to the increase in such stock under scrutiny. Secondly, it argues that these provisions were not intended to be applicable to a purchase of only the *outstanding* stock of another controlled group member.

In support of its first proposition, plaintiff points to the language of paragraph (4) (D), urging that the acquisition in a single transaction of all of the stock of a corporation theretofore not connected with the purchaser is not an *"increase* in * * * assets *by a member* of a controlled group"* since an "increase" presupposes prior stock holdings and the words "by a member" assume the existence of control at the time of, not after, the increase. Furthermore, any language in paragraph (6) from which a contrary inference might be drawn must be ignored inasmuch as paragraph (4) (D) *imposes* the reduction whereas paragraph (6) merely determines its *amount.* Its construction, says the plaintiff, effectively accomplishes the purpose of these provisions, which is the prevention of manipulation designed to create or duplicate credits by members of a controlled group. The Government, on the other hand, contends that paragraphs (4) (D) and (6) must be read together, and when this is done the transaction in this case is brought within the literal terms of these provisions: The acquisition of all of The Television Corporation's stock resulted in an "increase" in holdings of such stock from 0% to 100%, and under paragraph (6) it is necessary only that the controlled relationship exist "on any day of the taxable year * * *." Plaintiff claims additionally that the difference in the language of Sections 435(g) (4) (D) and (6) from the language of its predecessor, Section 713(g) (5) of the World War II statute,[9] indicates a congressional intent to

---

9. Section 713(g) (5) provides in pertinent part:

"If, on any day of the taxable year, the taxpayer and any one or more other corporations are members of the same controlled group, then the daily capital reduction of the taxpayer for such day shall be increased by whichever of the following amounts is the lesser:

"(A) The aggregate of the adjusted basis (for determining loss upon sale or exchange) of stock in such other corporation (or if more than one, in such other corporations) acquired by the taxpayer after the beginning of the taxpayer's first taxable year under this subchapter, minus the aggregate of the adjusted basis (for determining loss upon sale or exchange) of stock in such other corporation (or if more than one, in such other corporations) disposed of by the taxpayer prior to such day and after the be-

ginning of the taxpayer's first taxable year under this subchapter; or

* * * * *

If any stock or obligations described in subparagraph (A) or (B) was *disposed* of prior to such day, its basis shall be determined under the law applicable to the year in which so disposed of. The excluded capital of the taxpayer for such day shall be reduced by the amount by which the taxpayer's daily capital reduction for such day is increased under this paragraph. As used in this paragraph, a controlled group means one or more chains of corporations connected through stock ownership with a common parent corporation if (i) more than 50 per centum of the total combined voting power of all classes of stock entitled to vote, or more than 50 per centum of the total value of shares of all classes of stock, of each of the corporations (except the

guard against the result now sought by the Government. The Government counters that this change was merely formal, aiming only to group all the capital reduction items together under Section 435(g) (4).

This first issue thus drawn appears to present a novel question. As graphically shown in the opposing views of the parties, the meaning of Sections 435(g) (4) (D) and (6) is not free from ambiguity as to when the controlled relationship must exist, and it is therefore necessary to look beyond the written words to their purpose. As in United States v. Benedict, 338 U.S. 692, 696, 70 S.Ct. 472, 475, 94 L.Ed. 478 (1950), "No provision of the Code and nothing in the legislative history [10] or administrative practice [11] expressly settles the course to be followed. We, therefore, seek the purposes of the applicable sections of the Code and adopt that construction which best gives effect to these purposes." (Footnotes added.)

Plaintiff's construction necessarily assumes that the *only* purpose of these statutory provisions was the prevention of intercorporate machinations by controlled group members so as to create or duplicate credits. This may have been one purpose of the legislation, and it is accomplished by each of the constructions urged by the parties. But the relation of this provision to the excess profits tax statute as a whole and the circumstances of its enactment indicate that another, and at least equally important, purpose was to be served thereby. It was not until 1942 that paragraph (5) was added to Section 713(g) of the 1940 statute, possibly indicating (and this is presumed by both of the parties herein and all the commentaries which have been seen) that it was designed to correct some defect in the existing statute. A defect which did exist in the statute before the enactment of paragraph (5) can be shown by the following illustration. Suppose that corporation A transferred money or property to corporation B in exchange for stock of corporation B. The transfer of money or property by corporation A would not be reflected under Section 435(g) (4) of the 1950 Act as a capital reduction for the taxable year for that corporation. The transaction therefore would not affect the computation of corporation A's credit for the taxable year of the transfer unless it should happen to have a net capital addition for that year, in which case the addition would

common parent corporation) is owned directly by one or more of the other corporations and (ii) the common parent corporation owns directly more than 50 per centum of the total combined voting power of all classes of stock entitled to vote, or more than 50 per centum of the total value of shares of all classes of stock, of at least one of the other corporations."

10. See the legislative history to the original enactment in the Revenue Act of 1942 of the relevant provisions as an addition to Sec. 713—House Report No. 2333, 77th Cong., 1st Sess., 1942–2 Cum. Bull. 372, 475–76; Senate Report No. 1631, 77th Cong., 2d Sess., 1942–2 Cum. Bull. 504, 644–45—and to its re-enactment as Sections 435(g) (4) (D) and (6) of the 1950 Act—House Report No. 3142, 81st Cong., 2d Sess., 1951–1 Cum. Bull. 187, U.S.Code Cong.Service 1950, p. 4027; Senate Report No. 2679, 81st Cong., 2d Sess., 1951–1 Cum.Bull. 240, U.S.Code Cong.Service 1950, p. 4114;

House Report No. 3231, 81st Cong., 2d Sess., 1951–1 Cum.Bull. 268.

11. See Treas.Reg. 130, Sec. 40.435–7. The following language of Treas.Reg. 130, Sec. 40.435–7(c), upon which plaintiff relies as support for its construction, appears to add nothing to the statutory language:

"(c) Daily capital reduction—The daily capital reduction for any day of the taxable year is the sum of the following amounts:

\* \* \* \* \*

"(4) The amount determined under section 435(g) (6), relating *to an increase* in certain inadmissible assets held by the taxpayer, *if the taxpayer and one or more other corporations are members of a controlled group of corporations.* Section 435(g) (6) defines controlled group. The amount to be included in the daily capital reduction for any day, *with respect to such increase,* shall be the amount determined under (i) or (ii) below, whichever is the lesser. \* \* \*"
(Emphasis added by plaintiff.)

be offset (but not below zero) to the extent that the acquired stock constitutes a Section 440 inadmissible asset. But corporation $B$ would have under Section 435(g) (3) (A) a capital addition for the taxable year to the full extent of the assets transferred to it. Therefore, if corporation $A$'s net capital addition for the taxable year was less than the value of the stock acquired, the total credit taken by the two corporations against the total income of both would exceed that previously available to either one alone. This is remedied by paragraphs (4) (D) and (6), which cause corporation $A$ to have a capital reduction rather than a mere setoff against capital additions. An increase in the combined credits of both corporations, as illustrated above, has significance, of course, only when there is a practical identify of the two; obviously that is the reason a controlled relationship is prerequisite to the reduction. But it is only when the identity, or control, exists immediately *after* the transaction that the two corporations as a group will benefit by the increase in combined credits. Quite obviously then, plaintiff's construction, which would require control to exist prior to the transaction, leaves intact a patent defect in the statute which Congress surely must have intended to correct.

This view of the purpose of the legislation is not novel. In Morganton Full Fashioned Hosiery Co., 14 T.C. 695 (1950), it was urged by the taxpayer that the definition by Section 713(g) (5) of a controlled group in terms of "one or more *chains*" of corporations precluded application to only two corporations. Rejecting this argument, the court observed in 14 T.C. at 706:

> The reason for and the purpose of the elimination of the cost of the subsidiary in the computation of

daily invested capital would seem to be the prevention of a duplication of credit for what, in fact, is the same investment. This reason and purpose manifestly apply with equal force where the parent corporation had only one controlled subsidiary instead of two.

All of the commentaries which have come to the attention of the court likewise attribute this purpose both to the paragraphs involved here and to analogous provisions (relating to loans between members of a controlled group) of the excess profits tax.[12] Particularly pertinent here is a statement in the legislative history of Section 438 of the 1950 Act, which provides for the "new capital credit" when computation is by the invested capital method. Computation of the new capital credit is basically similar to that of taxable year capital changes under the income method. And somewhat analogous to the controlled-group-asset capital reduction of Section 435(g) (4) (D) is the "excluded capital" of Section 438, defined by Section 438(e) as "the amount of money or property paid in for stock, or as paid-in surplus, or as a contribution to capital, to the taxpayer * * * (2) by a transferor corporation if immediately after such transaction the transferor and the taxpayer are members of the same controlled group", the definition of which is identical to that in 435(g) (6). House Report No. 3142, 81st Cong., 2d Sess.[13] observes in respect to Section 438:

> "Excluded capital" * * * constitutes capital which has been added as a result of various types of intercorporate transactions which result in mere rearrangements of capital structure and do not actually increase the amount of capital employed in the production of income subject to excess profits tax.

12. E.g. Bryson, "The Excess Profits Tax Provisions of the Revenue Act of 1942," 91 U.Pa.L.Rev. 394, 425–27 (1943); Miller, "Income Credit: Base Period Capital Addition & Net Capital Additions & Reductions," N.Y.U. 10th Inst. on Fed.

Tax. 321, 349–50 (1952); 7A Mertens, Federal Income Taxation Sec. 42.99 n. 94, at 445 (1955).

13. 1951–1 Cum.Bull. 187, 222, U.S.Code Cong.Service 1950, p. 4080.

■ Untenable in view of the foregoing considerations is the plaintiff's further contention that the difference between the language of Section 713(g) (5) of the World War II statute and of Sections 435(g) (4) (D) and (6) of the Korean War statute indicates a Congressional intent to prevent the result reached here. In the absence of evidence that any change in substance was intended thereby, this difference only emphasizes rather than resolves the ambiguity of meaning, and the overriding purpose of the provisions as herein conceived therefore should control. Also, while it was not suggested by the parties, the fact that Section 438(e), which was enacted only a year before the provisions with which we are concerned, contains the phrase "if immediately after such transaction" though Section 435(g) (4) (D) does not, could be argued to manifest a Congressional intention to restrict the latter's application. But if this variation in terminology indicates anything, it could as readily be interpreted that Section 435(g) (4) (D) was meant to have a broader application than 438(e), that is, to apply both when control exists before and after the transaction. In light of the comparatively broad connotation of the phrase "on any day" in Section 435(g) (6) and the apparent purpose of these provisions, the latter interpretation is the more plausible.

The gist of the plaintiff's alternative theory is that inasmuch as the purpose of Sections 435(g) (4) (D) and (6) is to prevent a duplication of credit, the provisions have no application to an acquisition solely of *outstanding* stock since the corporation whose stock is purchased receives no capital addition and thus no credit. In this position plaintiff runs directly into Stoner-Mudge, Inc., 15 T.C. 419 (1950), which, holding adversely to the taxpayer's claim under Section 713

(g) (5) of the World War II statute, is the only case found to have considered this point.[14] There, in 15 T.C. at 421–23, it is stated:

We may assume that one of the purposes of enacting section 713(g) (5) was to prevent the duplication of excess profits credit. * * * But that does not mean that such was its sole purpose. The statute itself expresses no such limited purpose.

The general purpose of the excess profits tax was to provide revenue for the war emergency out of abnormal profits from large governmental expenditures for the war effort. * * * The particular section of the statute here in controversy is to be read in the light of the purposes for which the Excess Profits Tax Act was enacted.

* * * If it was the intention of Congress that there should be a reduction of capital only where a duplication of excess profits credit would result, it is fair to assume more appropriate language would have been used. In neither the Senate Report nor the House Committee Report is there any indication that the statute was to be so limited.

* * * * * *

The language of section 713(g) (5) being clear and unambiguous, we apply it as written. [Footnotes omitted.]

■ The Government's position is substantially that of Stoner-Mudge. Thus it is contended by the Government that the literal meaning of the provisions must control. This so-called "plain meaning rule"—that, in absence of a patent ambiguity, statutory language must be literally applied without resort to aids to construction—has been adhered to in many cases.[15] However, the

14. In at least two other cases in which acquisitions were only of outstanding stock this question was apparently not raised by the taxpayer and was not considered by the courts. See Morganton Full Fashioned Hosiery Co., supra; Petroleum Exploration, 16 T.C. 277, aff'd, 193 F.2d 59 (4th Cir. 1951).

15. See, e. g., United States v. Shreveport Grain & Elevator Co., 287 U.S. 77, 53 S.Ct. 42, 77 L.Ed. 175 (1932); Railroad

present vitality of this precept, which in any event never properly precluded use of construction aids other than legislative histories, is in some doubt. "But", observed Justice Frankfurter in Ass'n of Westinghouse Salaried Employees v. Westinghouse Elec. Corp., 348 U.S. 437, 444, 75 S.Ct. 489, 492, 99 L.Ed. 510 (1955), "that rule has not dominated our decisions. The contrary doctrine has prevailed. See Boston Sand & Gravel Co. v. United States, 278 U.S. 41, 48 [49 S.Ct. 52, 53, 54, 73 L.Ed. 170]; United States v. Dickerson, 310 U.S. 554, 561 [60 S.Ct. 1034, 1038, 84 L.Ed. 1356]." Perhaps the clearest exposition of the limited scope of the "plain meaning rule" and of the rationale of the "contrary doctrine" is the following excerpt from United States v. American Trucking Ass'ns, 310 U.S. 534, 543–544, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940):

There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning. When that meaning has led to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act. Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one "plainly at variance with the policy of the legislation as a whole" this Court has followed that purpose, rather than the literal words. When aid to construction of the meaning of words,

as used in the statute, is available, there certainly can be no "rule of law" which forbids its use, however clear the words may appear on "superficial examination." * * * Emphasis should be laid, too, upon the necessity for appraisal of the purposes as a whole of Congress in analyzing the meaning of clauses or sections of general acts. A few words of general connotation appearing in the text of statutes should not be given a wide meaning, contrary to a settled policy, "excepting as a different purpose is plainly shown." [Footnotes omitted.]

Cases applying these principles, often in reliance upon American Trucking, are numerous.[16] Thus, though a statutory provision may be thought literally unambiguous in isolation, a court nonetheless should consider the legislation as a whole and may also look to its legislative history in determining its purpose and its proper construction.

Indisputably the dominant overall purpose of the excess profits tax was the raising of additional revenue. But in its fundamental design this is a tax on "excess" income only, and a manifest subsidiary purpose, effectuated by and embodied in the excess profits *credit*, was the limitation of the tax's imposition to abnormal income.[17] Our immediate concern is with this subsidiary purpose, not the broad objective of raising revenue which is qualified to some extent, of course, by the credit provisions. While this is surely unnecessary overemphasis of the obvious, the weakness in the Government's literal construction lies, it is believed, in the failure to accord due regard to this subordinate objective and

Comm. of Wisconsin v. Chicago, B. & Q. R. Co., 257 U.S. 563, 588–589, 42 S.Ct. 232, 66 L.Ed. 371 (1922); Fisher Flouring Mills Co. v. United States, 270 F.2d 27, 30–31 (9th Cir. 1959).

16. E.g. N. L. R. B. v. Lion Oil Co., 352 U.S. 282, 288, 77 S.Ct. 330, 1 L.Ed.2d 331 (1957); Mastro Plastics Corp. v. N. L. R. B., 350 U.S. 270, 285, 76 S.Ct. 349, 100 L.Ed. 309 (1956); United States v. Rosenblum Truck Lines, Inc., 315 U.S.

50, 54–55, 62 S.Ct. 445, 86 L.Ed. 671 (1942); United States ex rel. Tillery v. Cavell, 294 F.2d 12, 15 (3d Cir. 1961); Peacock v. Lubbock Compress Co., 252 F.2d 892, 894–95 (5th Cir. 1958); Fulford v. Forman, 245 F.2d 145, 149 (5th Cir. 1957).

17. See House Report No. 3142, 81st Cong., 2d Sess., 1951–1 Cum.Bull. 187, 188, U.S. Code Cong.Service 1950, p. 4027.

the realistic nature of the Code provisions by which it was to be achieved.

To harmonize with the concept of the credit as a representation of "normal" income, Section 435 would logically, and does in the main,[18] attempt to make the representation an accurate and true one. Provisions thereof relating to capital changes do not depart from this general pattern. Ignoring for the moment Section 435(g) (4) (D), each of the capital addition items of paragraph (g) (3) and reduction items of paragraph (g) (4)—equity capital changes, distributions to shareholders from capital, contributions to capital, etc.—plays a specific part in the overall attempt to achieve a true representation of capital changes by taking into consideration only those capital transactions which *actually affect* the taxpayer's investment. The whole tone of these provisions may be characterized as equitable [19] and, above all, purposive.

Section 435(g) (4) (D), if construed as the plaintiff would have it, fits directly into this systematic scheme: By preventing the reflection of capital additions through transactions between controlled group members which in reality do not affect the total intercorporate capital, it, too, preserves the representation of only actual investment. Compare, in contrast, the anomolous effect of the Government's construction: Since the acquisition is solely of outstanding stock, a net capital reduction in the combined credit of the controlled group members results although there is, in fact, no change in the total intercorporate capital investment—the converse of the situation which paragraphs (4) (D) and (6) generally are considered to remedy. No reason has been suggested to the court, none has been found, which would warrant this inequitable result so discordant with the broad scheme of Section 435. Therefore the court rejects the Government's literal construction as unreasonable and in conflict with the policies of the statute.

The prevention of credit duplication is the *only* purpose ascribed to Section 435(g) (4) (D) and (6) by the commentaries [20] which have been seen and to Section 438(e) by that section's legislative history.[21] No further purpose suggests itself. In fact, it is only in Stoner-Mudge and in the Government's argument here that there has been found any suggestion that these provisions might have any further purpose. Stoner-Mudge's intimation that the general pur-

---

18. The only deviations are in the nature of alternatives advantageous to the taxpayer, such as computation of base period earnings from the best three of the four base-period years, the alternative computation based on growth (subsection (e) ), and the choice between the income and invested capital methods.

19. In fact, the notion of equitable treatment is basic to the allowance of a credit for capital addition, as is suggested in the following remarks in House Report No. 3142, 81st Cong., 2d Sess., 1951-1 Cum.Bull. 187, 190, U.S.Code Cong. Service 1950, p. 4032 concerning base-period additions but equally applicable to taxable year changes:

"[A]n adjustment of this character is needed to place corporations where investments were made late in the base period on a comparable basis with corporations where investments were made prior to, or in the early part of, the base period. Investments early in the base period are fully, or largely, reflected in the base-period earnings, but investment made in the latter half of the base period, will at best be only partially reflected in the base period earnings and may not affect those earnings at all."

Compare Rudick, "Tax Orientation under E P T III," 6 Tax L.Rev. 337, 363 (1951):

"In conclusion, it may be noted that as one struggles with the elaborate and difficult provisions of the statute, one cannot help but respect and admire the tremendous technical competence and skill which produced an appallingly complicated law in a relatively short span. The involved provisions, which to the uninitiated must seem like gibberish and can be understood by relatively few, are primarily the result of an attempt to achieve a statute which operates *fairly*. If the price of fairness is complexity, it is worth paying." [Emphasis added.]

20. See articles cited note 12 supra.

21. House Committee Report cited note 13 supra.

pose of raising additional revenue must control in the absence of express qualifying language in the statute is not, for the reasons discussed above, sufficiently persuasive. The Government, subscribing completely to the rationale of Stoner-Mudge, argues additionally that the purpose of these paragraphs is to correct not only "situations of accomplished abuse" but also "possibilities of abuse." But there is not the least hint of what these "possibilities" could be; none come to mind.

The court concludes that there is no statutory command which requires a capital reduction to be taken by a taxpayer which purchases the outstanding stock of another member of a controlled group. Accordingly, judgment is due to be entered in favor of plaintiff.